METROMEDIA, INC., PLAINTIFF-APPELLANT, v. DIRECTOR, DIVISION OF TAXATION, DEFENDANT-RESPONDENT.

Argued November 7, 1983—Decided July 23, 1984.

314

318

*Joseph P. LaSala* argued the cause for appellant (*Robinson, Wayne, Levin, Riccio & LaSala,* attorneys; *Kenneth Greene,* of counsel; *Mr. LaSala* and *Lawrence P. Platkin,* on the briefs).

*Harry Haushalter,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel).

The opinion of the Court was delivered by

HANDLER, J.

This case involves the validity of a tax deficiency assessment made by the defendant, Director, Division of Taxation (Director), against plaintiff, Metromedia, Inc., under the New Jersey Corporation Business Tax Act, *N.J.S.A.* 54:10A–1 to –40 (Act). Metromedia, Inc. (Metromedia or taxpayer) is a Delaware corporation engaged in the ownership and operation of television and radio stations. In determining the net business receipts of the taxpayer attributable to its operation in the state pursuant to the Act, the Director used a calculation referred to

as an "audience share." This calculation is designed to measure receipts attributable to New Jersey by relating the taxpayer's revenues to its listening and viewing audiences in the state. However, this method for determining the New Jersey receipts of a multi-state television or radio enterprise had not been used by the Director before its application to Metromedia in this case. The major issue, therefore, is whether the decision to use this factor in effect constitutes administrative rule-making, within the meaning of the Administrative Procedure Act, *N.J. S.A.* 52:14B–1 to –15 (APA), necessitating compliance with the statutory requirements of the APA governing the adoption of agency rules. We must also examine the issue of whether the Act itself, in the absence of an implementing regulation, authorizes the allocation of receipts by the use of the "audience-share" factor.

### I

Metromedia has filed corporate business tax returns since 1957, but disputes the deficiencies assessed against it only for the years 1972–1975. During those years, Metromedia owned and operated several television and radio stations, including stations WNEW–TV, WNEW–AM, and WNEW–FM, located in New York City [1] and serving the New York metropolitan area, and WIP–AM and WMMR–FM, located in Philadelphia [2] and

---

[1] All three stations' offices are located in New York City. All sales contracts were approved in New York and all commercials were aired from the New York locations of the stations. Only WNEW–AM maintained property in New Jersey. Its transmitter facility in Carlstadt consisted of a concrete blockhouse and four broadcast towers and was maintained and serviced by three full-time shift employees.

[2] Both stations' offices are located in Philadelphia, where the commercials are aired. All sales contracts are approved in New York. During the relevant time period, only WIP–AM maintained property in New Jersey. Its transmitter facility, located in Bellmawr, consisted of a concrete blockhouse and two broadcast towers, and Philadelphia-based employees performed part-time maintenance work at the site.

serving the Philadelphia metropolitan area. Metromedia earns revenue from the sale of network air-time to national and local advertisers represented by advertising agencies. Most of these agencies are located in New York City, and, for present purposes, none is situated in New Jersey. Rates charged for advertising are based primarily on the size of the listening or viewing audience in the area served by the station.

No activity in connection with advertising sales or receipts occurred in New Jersey. Consequently, for the years in question the taxpayer reported no advertising revenues from these stations as attributable to the state. The Director, however, during its 1978 audit, allocated some of Metromedia's business receipts to New Jersey by applying a factor called "audience share." This calculation purported to reflect New Jersey earnings that the Director claimed were generated by virtue of the stations' signals reaching audiences in the state. For each station reaching New Jersey, the Director multiplied Metromedia's total receipts by a fraction or percentage that consisted of a ratio of the station's New Jersey audience to its total audience. The sum of these results for each of the five stations reaching New Jersey audiences was then incorporated into the statutory formula used to determine the taxpayer's New Jersey franchise tax base, consisting of both net worth and net income.

The taxpayer sought review of this determination in the Tax Court, challenging the Director's authority to set and apply the allocation factor. The Tax Court ruled that the "audience share" concept in effect constituted a "rule," within the meaning of the APA, and therefore its adoption by application in this case was invalid because it failed to comply with the requirements applicable to the promulgation of agency rules. 3 *N.J.Tax* 397 (1981). Because of its disposition on this ground, the Tax Court did not address contentions that the Act was unconstitutionally vague and therefore violative of the Due Process Clause. 3 *N.J.Tax* at 405–06. The court concluded, however, that the statute "[does not] support the use of an

audience factor in the absence of an administrative rule, properly adopted * * *." *Id.* at 412–13.

The Director appealed and the Appellate Division reversed, finding that the Director's actions were authorized by the Act. 187 *N.J.Super.* 562, 564 (1983). We granted Metromedia's petition for certification to consider whether the Director's action was invalid for failure to comply with the APA, and whether the Director's use of an audience factor exceeded his discretionary authority under the Act. 97 *N.J.* 290 (1983).

## II

The New Jersey Corporation Business Tax Act imposes a franchise tax on all nonexempt foreign and domestic corporations that exercise a corporate franchise, do business, employ or own capital or property, or maintain an office in New Jersey. *N.J.S.A.* 54:10A–2. The tax is computed by reference to the taxpayer's net worth tax base and net income base. *N.J.S.A.* 54:10A–5; *see Fedders Corp. v. Director, Div. of Taxation,* 96 *N.J.* 376 (1984). The receipts or revenues of the taxpayer that are considered in the net income tax base for tax purposes are those that arise from (1) sales of tangible personal property from within this state, (2) services performed within the state, (3) rentals from property and royalties from the use of patents or copyrights within the state, and (4) all other business receipts that are earned within the state. *N.J.S.A.* 54:10A–6(B)(6).

For corporations that maintain a regular place of business outside of New Jersey, the Act recognizes that only a percentage of the taxpayer's net worth and net income may be the result of its activities in the state. Consequently, an "allocation" formula is applied to both the net worth and net income tax bases so that only those portions of net worth and net income, respectively, that are fairly attributable to the corporation's activities in New Jersey are used in the measure of the tax. *N.J.S.A.* 54:10A–6. The allocation formula consists of

three factors, namely, property, payroll and receipts. Each of the three factors in the so-called three-ply formula is expressed as a fraction, the numerator of which is, respectively, the taxpayer's New Jersey property, receipts, and payroll, and the denominator of which is the taxpayer's total property, receipts, and payroll generated by the operations of the entire enterprise. *N.J.S.A.* 54:10A–6(B). These fractions are averaged, and the combined fraction is then applied to the taxpayer's total net worth and net income in order to determine the percentage or portion of net worth and income properly attributable, and thus taxable, to New Jersey. *Id.*

It is the implicit premise of the Act that the statutory three-ply formula can only approximate the taxpayer's true net worth and income generated by its New Jersey activities. Hence, the Act gives the Director broad authority to adjust the allocation factor in order to reflect more accurately and fairly the activity, business, receipts, capital, entire net worth, or entire net income of a taxpayer reasonably referable to the state. *N.J.S.A.* 54:10A–8 authorizes the Director to make the following particular adjustments: (1) to adhere to those factors already set forth in the statutory formula, namely, property, receipts, and payrolls; (2) to include in the formula one or more other acceptable recognized factors, such as expenses, purchases, or existing contracts; and (3) to exclude one or more assets from the formula or from the entire net worth tax base. In addition to this specific authority, the Director is given broad general discretion to "apply * * * any other similar or different method calculated to effect a fair and proper allocation of the entire net income and the entire net worth reasonably attributable to the State." *Id.*

As noted, the Director used the "audience share" as a modification of the "receipts factor" of the three-ply formula in order to adjust the percentage of the taxpayer's total receipts allocable to New Jersey. Metromedia contends that the Director's determination was not authorized by any provisions of the Act

and exceeded the Director's statutory discretion.[3] The argument is that the use of the "audience factor" is *ultra vires*. We disagree.

■■ Clearly, the language of the statute vests broad authority in the Director to determine what income-producing activity of the taxpayer is reasonably referable to its business in New Jersey, so that this income can appropriately be used in the measure of the franchise tax. The statutory scheme recognizes that this is a highly specialized decision that entails considerable discretion. *See Fedders, supra,* 96 *N.J.* 376. The Director's discretion is bound by standards of "sound accounting principles." *N.J.S.A.* 54:10A–8(e); *R.H. Macy & Co., Inc. v. Director, Div. of Taxation,* 77 *N.J.Super.* 155 (App.Div.1962), aff'd o.b., 41 *N.J.* 3 (1963). It is nonetheless as broad as necessary to enable the Director to determine the fair value of the taxpayer's net worth, *Hawthorne Fabrics v. Kingsley,* 41 *N.J.* 521 (1964), as well as the percentage of net worth and net income that can be attributed to New Jersey, *F.W. Woolworth v. Director, Div. of Taxation,* 45 *N.J.* 466 (1965); *see Household Fin. Corp. v. Director, Div. of Taxation,* 36 *N.J.* 353 (1962).

The broad question of statutory interpretation can be narrowed to whether the use of an audience-share factor to determine the taxpayer's "receipts earned within the State" would constitute any "other similar or different method" of allocation that is made available to the Director under *N.J.S.A.* 54:10A–8(e) to fashion an accurate allocation factor. A "similar method" would presumably be one comparable to the allocation methods specified under the allocation formula in *N.J.S.A.* 54:10A–8(e), namely, receipts, property, and payroll. By exam-

---

[3] In this case, the new allocation factor, consisting of the audience factor, was a result solely of an adjustment to the numerator of the receipts fraction. No adjustment was made to the denominator of the receipts fraction or to the numerators or denominators of the payroll and property fractions. See discussion, *supra* at 323.

ple, the Director is specifically empowered to include in the formula, as an "acceptable recognized factor," the value of existing contracts, if in a given case this were relevant in the operation of a particular enterprise. *N.J.S.A.* 54:10A–8(b).

Here, the relevance of the listening and viewing audience of a broadcast enterprise as an allocation factor may be premised on its obvious relationship to the enterprise's "customers". Its utility as an allocation factor applicable to the income of the entity inheres in its perceived correlation to advertising revenues. Consequently, if it is reasonable to presume a relationship between the size of the taxpayer's audiences and its advertising revenues, then a factor measuring or attributing revenues in terms of audience size would not facially be unsound or arbitrary.[4] These considerations influenced the Tax Court, which said:

> Each of plaintiff's New York and Philadelphia radio and television stations transmitted a signal that reached a specified geographical area known as a "primary coverage area." All five of the stations had a primary coverage area that included areas within New Jersey. For the tax years in question approxi-

---

[4]As presented by the Tax Court, 3 *N.J.Tax* at 403, the taxpayer's calculation of the allocation fraction, in accordance with the statutory formula, was:

| | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Property fraction | 3.5083% | 3.0654% | 2.740% | 2.6544% |
| Payroll fraction | .1389 | .1251 | .171 | .0903 |
| Receipts fraction | –0– | –0– | –0– | –0– |
| Allocation factor (average of the three fractions) | 1.2157% | 1.0635% | .9703% | .9149% |

The Director's calculation of the allocation fraction, 3 *N.J.Tax* at 404, modifying the receipts factor by the "audience share," was:

| | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|
| Property fraction | 3.5083% | 3.0654% | 2.740% | 2.6544% |
| Payroll fraction | .1389 | .1251 | .171 | .0903 |
| Receipts fraction | 6.8343 | 6.6831 | 6.4722 | 6.5996 |
| Allocation factor | 3.4938% | 3.2912% | 3.1277% | 3.1148% |

mately 30% of the total listening and viewing audience in primary coverage areas for WNEW–TV, WNEW–AM and WNEW–FM, and approximately 21% of the total listening audience in the primary coverage areas for WIP–AM and WMMR–FM, was located in New Jersey. Although there was no specific proof in this regard, it can logically be assumed that the stations' advertisers most likely considered the entire geographical makeup of the stations' audiences in their decision to purchase advertising time. [3 *N.J.Tax* at 401.]

Even if it is debatable that an "audience share" is a "similar method" or an "acceptable recognized factor," *N.J.S.A.* 54:10A–8(e) authorizes the Director to adopt a "different method" if it serves to effect "a fair and proper allocation" of the taxpayer's tax base "reasonably attributable to the State." Hence, if the resultant allocation can be considered "fair and proper," and the revenues so calculated can be regarded as "reasonably attributable to the State," the discretionary use of the "audience factor" would be authorized.[5]

There is some extrinsic evidence that an audience factor, applied to taxpayers engaged in the television and radio industry, can be regarded as a fair and proper method for effecting a reasonable attribution of revenues to the state. This method of measuring or attributing "receipts" was suggested in the *Report of the New Jersey Tax Policy Committee, Part V* (Tax Policy Report), submitted to Governor Cahill on February 23, 1972. The Committee observed that the Act empowered the State to tax foreign corporations and recognized that the tax scheme authorized the taxation of corporations whose activities might not squarely fit into the conventional application or understanding of the three-factor allocation formula.

---

[5]According to the Tax Court, the difference in the computation of the taxpayer's tax base by using the audience share was illustrated by the 1972 tax year. In 1972 WNEW–TV had overall receipts of $22,682,000, and 29.1% of its audience was ascribed to New Jersey. The Director attributed $6,600,462 to New Jersey receipts. Adding this amount to the products of similar calculations for the other four stations, the Director determined that Metromedia's 1972 New Jersey receipts totalled $10,039,489 and concluded that Metromedia's receipt fraction under *N.J.S.A.* 54:10A–6(B) was 6.8343% ($10,030,489/$146,-896,667 (Metromedia's absolute total 1972 receipts)). 3 *N.J.Tax* at 404.

> [T]here is a need for an overall review of the applicability and impact of the general apportionment formula to a number of specialized businesses, with a view toward the adoption of apportionment methods that would be more appropriate to these businesses. * * * [Tax Policy Report at 31.]

Significantly, the Committee further stated:

> [T]he receipts factor, geared to sales of tangible property, is not adapted to television and radio stations, with a consequence that probably little or no receipts allocation would be made to this State. In lieu of the receipts allocation contained in the general formula, a more realistic and more economically justifiably [sic] technique might be the allocation of receipts by reference to the listening audience. It is our understanding that this is the way television and radio time charges are determined, so that receipts allocation by reference to the advertising market would respond to the economic realities of the business. [Id. at 31, 32.]

██ The use of the audience-share factor seems reasonable. As the Tax Policy Report noted, such an interpretation better accommodates to the economic realities of the broadcast business, in terms of attribution of revenues.[6] We have recognized that the Director's expertise, particularly when exercised in the specialized and complex area covered by these provisions of the Act, is entitled to great respect by the courts. *See, e.g., F.W. Woolworth v. Director, Div. of Taxation, supra,* 45 *N.J.* 466; *Household Fin. Corp. v. Director, Div. of Taxation, supra,* 36 *N.J.* 353; *R.H. Macy & Co., Inc. v. Director, Div. of Taxation, supra,* 41 *N.J.* 3. Moreover, the agency's interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable. *New Jersey Guild of Hearing Aid Dispenser's v. Long,* 75 *N.J.* 544 (1978); *Atlantic Transp. Co. v. Director, Div. of Taxation,* 12 *N.J.* 130 (1953). Accordingly, we conclude that in the case of a multi-state television and radio station enterprise whose broadcast operations cover audiences in New Jersey, the Act permits the discretionary choice by the

---

[6]Apparently, New York State, prompted by concerns similar to those expressed in the Tax Policy Report, authorized the use of an "audience-share" factor. *Conde Nast Publications, Inc. v. State Tax Comm'n,* 51 *A.D.*2d 17, 378 *N.Y.S.*2d 132 (1976) appeal dismissed, 39 *N.Y.*2d 889, 386 *N.Y.S.*2d 393, 352 *N.E.*2d 580 (1976); *Capital Cities Communications, Inc. v. State Tax Comm'n,* 65 *A.D.*2d 25, 411 *N.Y.S.*2d 46 (1978). See discussion *infra,* at 335.

Director to compute the corporate taxpayer's receipts attributable to New Jersey by the application of a factor based upon an "audience share" in this state.

### III

The critical issue in this case is whether the agency determination to apply the audience share factor in allocating taxpayer's receipts to New Jersey encompassed *de facto* rule-making and, if so, whether that determination, in order to be valid, had to comply with the requirements governing the promulgation of administrative rules as provided by the APA. Basing its argument upon the statutory definition of "rule" under the APA, *N.J.S.A.* 52:14B–2(e), Metromedia claims that the "audience share factor" that was applied by the Director is tantamount to an agency law or regulation—it constitutes a formal expression or statement of administrative policy effectuating the agency's statutory authority, and, consequently, it must be considered an administrative rule.

Resolution of this issue involves a consideration of the nature of a "rule" as it affects administrative agency policy-making and regulation. *See generally* Mayton, "The Legislative Resolution of the Rulemaking Versus Adjudication Problem in Agency Lawmaking," 1980 *Duke L.J.* 103 (1980). *N.J.S.A.* 52:14B–2(e) provides:

(3) "Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy * * *.

■ There are several important elements of agency action that in combination serve to define it as either an administrative rule or an administrative adjudication. A critical aspect of this definition is the "general applicability and continuing effect" of the pronouncement. *Id.; see, e.g., Crema v. New Jersey Dept. of Envtl. Protection,* 94 *N.J.* 286 (1983); *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n,* 85 *N.J.* 325, 337 (1981) (Handler, J., concurring); *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138 (1962); *Glaser v. Downes,* 126 *N.J.Super.* 10 (App.Div.

1973), certif. den. 64 *N.J.* 513 (1974); *see also Securities & Exchange Comm'n v. Chenery Corp.*, 332 *U.S.* 194, 67 *S.Ct.* 1575, 91 *L.Ed.* 1995 (1947); *N.L.R.B. v. Wyman-Gordon Co.*, 394 *U.S.* 759, 777, 89 *S.Ct.* 1426, 1435, 22 *L.Ed.*2d 709, 721 (1969) (Douglas, J., dissenting). It has been consistently recognized that the widespread, continuing, and prospective effect of an agency pronouncement is the hallmark of an "administrative rule." *See* Shapiro, "The Choice of Rulemaking or Adjudication in the Development of Administrative Policy," 78 *Harv.L.Rev.* 921, 929–42 (1965); Robinson, "The Making Of Administrative Policy: Another Look At Rulemaking and Adjudication and Administrative Procedure Reform," 118 *U.Pa.L.Rev.* 485, 513–28 (1970).

An agency determination that is intended to be applied as a general standard and with widespread coverage and continuing effect can also be considered an administrative rule if it is not otherwise expressly authorized by or obviously inferable from the specific language of the enabling statute. *See Crema, supra,* 94 *N.J.* at 301; *cf. Airwork v. Director, Div. of Taxation,* 97 *N.J.* 290 (1984) (where tax statute is sufficiently specific, determination in the form of a tax assessment does not require antecedent rule); *R.H. Macy & Co., Inc., supra,* 41 *N.J.* 3 (when adequate legislative standard exists for administrative guidance, general rule is not required). For example, in *Boller Beverages, Inc., supra,* 38 *N.J.* 138, this Court held that a determination by the Director of the Division of Alcoholic Beverage Control regarding the packaging and labelling of corn whiskey was neither authorized by sufficiently specific statutory language nor by any implementing regulation. The Court stressed the intended, general applicability of the Director's determination and observed that "[w]here an administrative agent is given full rule-making power, he must, in all fairness, bottom an alleged violation on general legislation before he may rule in a particular case. The general mandate, either statutory or administrative, must precede the specific violation." *Id.* at 155.

■ Further, when the agency action is concerned with "broad policy issues" that affect a large segment of the regulated or general public, rule-making as such is implicated. *Crema, supra,* 94 *N.J.* at 301–02. The APA itself recognizes that an agency action or determination "that implements or interprets law or policy" can constitute an "administrative rule." *N.J.S.A.* 52:14B–2(e). It is particularly appropriate that parties affected by the proposed agency action have the opportunity to participate in the process leading to the agency determination. *Bergen County Pines Hosp. v. Dept. of Human Services,* 96 *N.J.* 456 (1984); *see also Historic Green Springs, Inc. v. Bergland,* 497 *F.Supp.* 839, 854 (E.D.Va.1980) ("[W]ithout published rules of procedure and substantive criteria for [the taking of the proposed action, affected parties] have been denied any meaningful opportunity for informal response to the proposed action").

■ Similarly, an agency determination can be regarded as a "rule" when it effects a material change in existing law. *See Crema, supra,* 94 *N.J.* at 302; K.C. Davis, *Administrative Law Treatise* § 7:25 at 186 (2d ed. Supp.1982); *Ford Motor Co. v. Fed. Trade Comm'n,* 673 *F.*2d 1008, 1009 (9th Cir.1981), *cert.* den., 459 *U.S.* 999, 103 *S.Ct.* 358, 74 *L.Ed.*2d 394 (1982) (an agency determination that changes existing law and has widespread application must be addressed by rule-making and not adjudication). This feature relates not only to fairness to the individual party actually before the agency but to other persons as well. When an agency's determination alters the *status quo,* persons who are intended to be reached by the finding, and those who will be affected by its future application, should have the opportunity to be heard and to participate in the formulation of the ultimate determination. *See Bergen County Pines Hosp., supra,* 96 *N.J.* at 469; *Crema, supra,* 94 *N.J.* at 303; *Boller Beverages, Inc., supra,* 38 *N.J.* at 151.

■ We have also recognized that the factfinding process that characterizes rule-making is much more flexible and

expansive than that governing quasi-judicial adjudication. Where the subject matter of the inquiry reaches concerns that transcend those of the individual litigants and implicate matters of general administrative policy, rule-making procedures should be invoked. *See Dougherty v. Dept. of Human Servs.*, 91 *N.J.* 1 (1982); *Texter v. Dept. of Human Servs.*, 88 *N.J.* 376 (1982). The procedural requirements for the passage of rules are related to the underlying need for general fairness and decisional soundness that should surround the ultimate agency determination. *See Crema, supra*, 94 *N.J.* 286. These procedures call for public notice of the anticipated action, broad participation of interested persons, presentation of the views of the public, the receipt of general relevant information, the admission of evidence without regard to conventional rules of evidential admissibility, and the opportunity for continuing comment on the proposed agency action before a final determination. *See N.J. S.A.* 52:14B-4.

We can synthesize from this authority that an agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that. (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on adminis-

trative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication.

■ We acknowledge that in many cases the question of whether the agency determination is a rule or an adjudication is a close one. Frequently, the agency determination is a hybrid, partaking of both the rule-making and adjudicatory mode. *See Bally Mfg. Corp., supra*, 85 *N.J.* at 341–43 (Handler, J., concurring) (recognizing procedures for "specific rule-making"; rule making may be appropriate even when proposed rule has special impact upon particular parties as well as the public). The inquiry can be further clouded because we have noted that an agency can promulgate a rule that is highly particularized, constituting, in effect, "individualized rule-making." *Id.; see Bergen County Pines Hosp., supra*, 96 *N.J.* 456, 476; *Boller Beverages, Inc., supra*, 38 *N.J.* 138, 151–52. Other agency proceedings that involve contested, quasi-judicial hearings effectuate agency regulatory jurisdiction and can be characterized as "generalized adjudication." *See, e.g., R.H. Macy & Co., Inc., supra*, 41 *N.J.* 3; *see also In re Uniform Admin. Procedural Rules*, 90 *N.J.* 85, 92 (1982). Nevertheless, rule-making and adjudication are not interchangeable. If the several relevant features that typify administrative rules and rule-making weigh in favor of action that is quasi-legislative in character, rather than quasi-judicial or adjudicatory, that balance should determine the procedural steps required to validate the ultimate agency action.

In the instant case, the Director claims that *N.J.S.A.* 54:10A–8 empowers him to adjust the allocation factor determined pursuant to *N.J.S.A.* 54:10A–6. He maintains that his determination—rendered as an *ad hoc* decision resulting in an adjudication in a contested case—was sufficiently specifically authorized by the Act so as to obviate the need for any

additional implementing regulations. *See Equitable Life Mortgage & Realty Investors v. Div. of Taxation,* 151 *N.J.Super.* 232, 240 (App.Div.1977), certif. den., 75 *N.T.* 535 (1977).

The Appellate Division agreed, 187 *N.J.Super.* at 565, and reversed the Tax Court's conclusion that, absent agency rules or regulations, the Director lacked the authority to assess a deficiency based upon the audience share factor. The Appellate Division relied on *R.H. Macy & Co., Inc., supra,* 41 *N.J.* 3, where the court upheld the Director's action in adjusting, without any implementing regulations, the method of valuing Macy's inventory for purposes of computing net worth under *N.J.S.A.* 54:10A–4(d). Although *R.H. Macy & Co., Inc., supra,* supports the general proposition that an agency may make decisions with substantive effect without prior promulgation of a rule or regulation, there were two features that supported that result. One was the recognition that the determination might not be of unvarying application in all similar cases. The other was the accepted adequacy and specificity of the legislative standard in guiding the particular administrative decision. *Id.* In *Airwork, supra,* 97 *N.J.* 290, decided today, we reached a similar conclusion, holding that where the tax statute addressed the transaction with sufficient specificity, an implementing rule was not a prerequisite to the exercise of the Director's statutory authority.

It does not follow that, because the Director has statutory discretion, the *manner* in which this discretion is exercised is not governed by the standards that determine whether rule-making or adjudication must be followed in a given case. We have acknowledged that this procedural choice itself is highly discretionary, and that agencies have wide latitude in improvising appropriate procedures to effectuate their regulatory jurisdiction. *See Bally Mfg. Corp., supra,* 85 *N.J.* at 338 ("Administrative agencies enjoy a great deal of flexibility in the proceedings most suitable to achieving their regulatory aims."); *Heir v. Degnan,* 82 *N.J.* 109, 121 (1980). Further, we have noted that both the rule-making and the adjudicatory mode serve to

effectuate legislative and administrative policy, *In re Uniform Admin. Procedural Rules, supra,* 90 *N.J.* at 92. Nevertheless, this discretion is not unbounded. *See N.J.S.A.* 52:14B–2(b), (c), (e). The standards that we have developed set its outer limits and control the choice of proceedings. *See, e.g., Crema, supra,* 94 *N.J.* at 299 ("When the agency is concerned with "broad policy issues" that affect the public-at-large or an entire field of endeavor or important areas of social concern, or the contemplated action is intended to have wide application and prospective effect, rule-making becomes the suitable mode of proceeding."); *Boller Beverages, Inc., supra,* 38 *N.J.* at 155; *see also N.L.R.B. v. Bell Aerospace Co.,* 416 *U.S.* 267, 294, 94 *S.Ct.* 1757, 1771, 40 *L.Ed.*2d 134, 154 (1974) ("[T]here may be situations where the Board's reliance on adjudication would amount to an abuse of discretion or a violation of the Act.").

█ In balancing the relevant factors before us, we are satisfied that the instant agency determination constituted a rule, and that its adoption required compliance with statutory rule-making procedures. The challenged determination clearly is one of general applicability to the regulated class. It is essentially prospective in nature, notwithstanding its attempted application to the taxpayer in this case. It was intended to have continuing effect, since, as the Director conceded, the audience share factor applies to all other broadcasters similarly situated to Metromedia. The Director admitted at trial that "[a]ll broadcasters * * * who are in the same predicament or situation as [Metromedia] would be subject to the revision." There is no question, therefore, that the determination is intended to be a rule of unvarying application to all similar cases.

█ Further, the determination was not otherwise expressly provided for by the statute, nor was it clearly and obviously implied. On this point, we note that the New York State courts, in *Conde Nast Publications, Inc. v. State Tax Comm'n, supra,* 51 *A.D.*2d 17, 378 *N.Y.S.*2d 132, and *Capital Cities Communications, Inc. v. State Tax Comm'n, supra,* 65

*A.D.*2d 25, 411 *N.Y.S.*2d 46, rejected the argument that the express language of the New York legislation empowering the tax commission to adjust the allocation percentage (based upon the three factors of payroll, property and receipts, *N.Y.Tax Law* § 210(3)(a)), authorized the substitution of an audience share approach. Significantly, the New York legislation, *N.Y.Tax Law* § 210(8) (McKinney 1979), which so empowers the tax commission, contains language that is virtually identical to the language of *N.J.S.A.* 54:10A–8(e). Subsequently, the New York authority enacted regulations, *N.Y.Tax Reg.* § 4–4.3(f)(2), pursuant to New York's Administrative Procedure Act, which provide for the use of an audience share factor when calculating the receipts fraction.

 In addition, the Director's determination reflects an interpretation of the enabling law and constitutes a decision on administrative policy, comporting with the general definition of a rule under the APA, *N.J.S.A.* 52:14B–2(e). The resolution of issues implicated in such a determination is made most appropriately by invoking procedures designed for the adoption of administrative rules. *See Dougherty v. Dept. of Human Servs., supra,* 91 *N.J.* 1; *Texter v. Dept. of Human Servs., supra,* 88 *N.J.* 376. That did not occur in the proceedings leading to the Director's determination here. The Tax Court recognized that while the audience factor was conceptually reasonable as related to the allocation of revenues, "there was no specific proof in this regard." 3 *N.J.Tax* at 414. Also, it is of some significance that the Committee on State Tax Policy, in its review of the Act and the allocation tax policy formula, believed that the subject matter was legislative or quasi-legislative in character and therefore suitable for rule-making. It "recommend[ed] that the Standing Committee of Tax Legislation * * * * "

review the existing apportionment formula and practices, as applied to specialized industries; that it analyze the amount of revenues collected from such industries; and devise and *recommend,* where appropriate, the *enactment of legislation or the promulgation of regulations of apportionment and alloca-*

*tion methods,* which will more fairly reflect the activities, income and net worth, of such industries attributable to the State. [Tax Policy Report at 32 (emphasis added).]

■ Further, the agency determination did not itself arise from the development of an evidential record that characterizes adjudication. The Tax Court's discussion of the agency's adoption of the audience share factor and its application to Metromedia in the form of a tax assessment instructively draws the distinction between a "rule" and an adjudicatory "finding."

The audience factor adopted by defendant * * * is * * * an agency statement that will apply generally to all similarly situated broadcasters, and which implements and interprets both law and public policy. It does not, as defendant maintains, come within the exclusion for "agency decisions and findings in contested cases." This is so because the audience factor employed by defendant represents neither a decision nor a finding of the Division of Taxation. All that can be properly characterized as a decision or finding is defendant's ultimate conclusion as to plaintiff's liability. The audience factor was * * * a rule of general applicability employed by defendant to permit him to make findings and render a decision in this case. Defendant's "decision" * * * was that plaintiff owed additional franchise taxes for the tax years in question, and not that an audience factor is the proper tool with which to allocate such taxes for an out-of-state broadcaster such as plaintiff. [3 *N.J.Tax* at 406.]

Consequently, the Director's determination is not excepted from the APA definition of a rule as an "agency finding in [a] contested case." *N.J.S.A.* 52:14B-2(e).

■ *N.J.S.A.* 54:10A-27 empowers the Director to implement rules and regulations in conjunction with the statutory authority. The broad language of *N.J.S.A.* 54:10A-8(e) and the subject matter of the agency's proceedings involved in this case offer a prime example of where "[t]he function of filling in the interstices of [legislation] should be performed, as much as possible, through [the] * * * promulgation of rules to be applied in the future." *Securities & Exchange Comm'n v. Chenery, supra,* 332 *U.S.* at 202, 67 *S.Ct.* at 1580, 91 *L.Ed.* at 2002. The necessity, as well as desirability, of administrative rulemaking in this context is supported by this Court's reasoning in *Boller Beverages, Inc., supra,* 38 *N.J.* at 151–52:

The theory of administrative rule-making is, of course, that in certain fields and in certain respects the public interest is better served by delegating a large part of detailed lawmaking to the expert administrator, controlled by policies, objects and standards laid down by the legislature, rather than by having all the details spelled out through the traditional legislative process. Administrative rule-making remains in essence, however, the enactment of legislation of general application, prospective in nature. The object is not legislation *ad hoc* or after the fact, but rather the promulgation, through the basic statute and the implementing regulations taken as a unitary whole, of a code governing action and conduct in the particular field of regulation so those concerned may know in advance all the rules of the game, so to speak, and may act with reasonable assurance. Without sufficiently definite regulations and standards, administrative control lacks the essential quality of fairly predictable decisions. Persons subject to regulation are entitled to something more than a general declaration of statutory purpose to guide their conduct before they are restricted or penalized by an agency for what it then decides was wrong from its hindsight conception of what the public interest requires in the particular situation.

This reasoning applies with similar force to the agency action that is the subject of this appeal. Accordingly, we find that the action taken by the Director, despite reliance upon statutory authority, is nonetheless invalid absent the prior promulgation of rules in compliance with the Administrative Procedure Act. *See Crema, supra,* 94 *N.J.* at 299.

## IV

In conclusion, we recognize that the language of the New Jersey Corporation Business Tax Act grants the Director needed broad authority to modify the statutory formula for determining a multi-state taxpayer's New Jersey tax base by which the tax is measured. In a case such as this, involving a multi-state radio and television enterprise reaching audiences in several states, the language of the statute supports the determination of a more realistic method than provided by the statutory three-ply formula to calculate the receipts of the taxpayer that can fairly and reasonably be attributable to its activities in New Jersey. The "audience factor" is based upon a presumed economic correlation between revenues derived from advertising over the taxpayer's network and the size and

location of its viewing and listening audiences. It would constitute a fair and appropriate method for allocating revenues. The actual determination to use such an allocation method, however, requires implementing regulations and recourse to rule-making procedures.

In reaching this conclusion, we have noted but determined not to address taxpayer's constitutional claims. The record is insufficient with respect to these claims, the lower courts did not resolve them, and, in light of our determination requiring further administrative proceedings, these claims may again be asserted. These considerations reinforce the Tax Court's conclusion that the Director's determination, in the form of the tax assessment against Metromedia, and the adoption of the audience share factor to make this assessment, applied without complying with the requirements of the APA governing the promulgation of administrative rules and regulations, was invalid.

Accordingly, the Appellate Division's judgment is reversed and the Tax Court judgment is affirmed.

Reversed.

WILENTZ, Chief Justice, and POLLOCK and O'HERN, Justices, dissenting:

We would affirm the judgment of the Appellate Division, substantially for the reasons expressed by Judge Furman in his opinion reported at 187 *N.J.Super.* 562.

*For reversal* —Justices CLIFFORD, SCHREIBER, HANDLER and GARIBALDI—4.

*For affirmance*—Chief Justice WILENTZ and Justices POLLOCK and O'HERN—3.