KUSKIN, J.T.C.
Plaintiff, Home Depot U.S.A., Inc., has appealed from the denial by defendant, Director of the New Jersey Division of Taxation (“Director”), of plaintiff’s claim for a refund of sales tax in the sum of $1,976,876.95. Plaintiff paid the tax for the period August 1, 1999 through July 31, 2003 (“Refund Period”) with respect to purchases made with the use of plaintiffs private label credit card by customers who later failed to pay their credit card indebtedness. Three companies unrelated to plaintiff issued the credit cards and the indebtedness was payable to them. The Director has moved for summary judgment dismissing the appeal. For the reasons set forth below, I grant the Director’s motion.
The following facts either were stipulated by the parties or are not in dispute. Plaintiff operates retail home improvement centers in New Jersey and elsewhere in the United States. During the Refund Period, plaintiff offered its customers the option of purchasing merchandise through the use of its private label (“Home Depot”) credit card. The cards were issued by Monogram Credit Card Bank of Georgia (“Monogram”), General Electric Capital Corp. (“GE Capital”), and General Electric Capital Financial Inc. (“GE Financial”) pursuant to separate agreements with plaintiff each dated as of August 4, 1997 (collectively the “Agreements”). The agreement with Monogram related to purchases by individuals for personal, family, or household use while the GE Capital and GE Financial agreements related to purchases other than for personal, family or household use. The parties *26 provided no explanation as to why separate agreements were in effect with GE Capital and GE Financial both relating to the same category of customers. I will refer to Monogram, GE Capital, and GE Financial collectively as the “Finance Companies,” and will sometimes refer to any one of them as a “Finance Company.”
Each of the Agreements contained the following provisions. In order to obtain plaintiffs private label credit card, a customer was required to complete a credit card application at plaintiffs store location, and the store was required to forward the application to the appropriate Finance Company. The Finance Company, “in its sole discretion,” then determined the creditworthiness, range of credit limits, and credit criteria to be used in evaluating each application. If a Finance Company rejected an application, plaintiff had no recourse.
Each Finance Company was “the sole and exclusive owner of all documents,” credit slips, and documentation relating to the credit card accounts and was entitled to receive all payments from cardholders. Plaintiff “acknowledge[d] and agree[d] that it ha[d] no right, title or interest in any of the foregoing [documents and accounts] and no right to payment by [cardholders on [a]ceounts or any proceeds in respect of the [accounts.” All procedures for collecting amounts due on the credit card accounts were “under the sole control and discretion” of the Finance Company.
At the end of each business day, plaintiff transmitted electronically to each Finance Company data relating to transactions which occurred during that day using credit cards issued by that Finance Company. Credit card charge slips were to be delivered to the appropriate Finance Company within seven days after the transaction date. With respect to transaction data received before 4:00 p.m. on a business day, the Finance Company was obligated to remit to plaintiff by the next business day the full amount of the charges set forth in the transaction data, including sales tax charged in connection with the transactions. As to transaction data arriving at the Finance Company after 4:00 p.m. on a business day, payment was to be remitted on the second business day thereafter. In remitting the payments, the Finance Company *27 had the right to deduct any chargebacks against plaintiff (generally relating to breaches of warranty or other defaults by plaintiff and customer disputes as to the amount or existence of the credit card obligation), and a service fee.
The service fee payable to Monogram in connection with “promotional” purchases, that is, purchases in which Monogram agreed to waive the financing charge if the customer made timely payment, ranged from .2% to 13.8% of the aggregate purchase price for purchases of less than $2,000 and from .7% to 11.6% for purchases of $2,000 or more. For “non-promotional” purchases, the service fee varied from zero to .95% of the purchase amount. For GE Capital, the service fee ranged from 3.24% to 3.49% on all purchases, and, for GE Financial, the range was 1.91% to 2.77%. The variations in service fee amounts charged by each Finance Company were functions of the credit standing of the customer and the time period within which payment was due on the credit card debt.
Plaintiff had no credit risk with respect to purchases made using its private label credit cards. The Agreements provided that “all credit losses on [a]ceounts shall be solely borne at the expense of [the Finance Company] and shall not be passed on to [plaintiff]” except for any chargebacks. No issues relating to chargebacks are relevant to plaintiffs contentions in this matter.
Notwithstanding that it bore no direct risk with respect to nonpayment of credit card indebtedness, plaintiff seeks a refund of sales tax it was required to pay, and did pay, in connection with sales during the Refund Period made with the use of plaintiff’s private label credit card by customers who defaulted on their credit card indebtedness. Plaintiff bases its claim on N.J.S.A. 54:32B-12(c), a provision of the New Jersey Sales and Use Tax Act, N.J.S.A. 54:32B-1 to -29, and on N.J.A.C. 18:24-23.1 and - 23.2. In pertinent part, N.J.S.A. 54:32B-12(c) authorizes the Director to “provide by regulation for the exclusion from taxable receipts ... of amounts representing sales where the ... charge ... has been ascertained to be uncollectible or, in the case the tax has been paid upon such ... charge ..., for refund or credit of *28 the tax so paid.” The regulations the Director promulgated pursuant to the statute provide as follows:
A vendor [1] of taxable tangible personal property or services must charge and remit the sales tax on all transactions whether for cash or credit.
[.N.J.A.C. 18:24-23.1.]
Where the sales tax in connection with a sale has been remitted to the Division of Taxation and the account receivable has proven to be worthless and uncollectible, an application for a refund may be filed with the Director within four years from the payment thereof.
I'N.J.A.C. 18:24—23.2(a).]
The latter regulation includes an explanation of its functioning under three circumstances. It permits a total refund where the vendor has collected no money on account of the receivable or sale, and, where a vendor has collected less than the amount payable as tax, it permits a refund based on the difference between the amount remitted to the Division and the amount the vendor collects. N.J.A.C. 18:24-23.2(a)(l) and (3). Where the vendor has collected an amount with respect to the receivable “equal to or exceeding the amount of sales tax required to be remitted to the Division, the claim for refund will be denied.” N.J.A.C. 18:24-23.2(a)(2).
Based on the preceding statutory and regulatory provisions, plaintiff contends that, as a vendor, it is entitled to a refund of sales tax it paid with respect to private label credit card transactions during the Refund Period where the customers defaulted on indebtedness owed to the Finance Companies. Plaintiff acknowledges that it did not directly suffer any loss from the defaults. It asserts, however, that it funded the bad debt losses suffered by the Finance Companies because the service fees it paid to them included an amount constituting reimbursement for projected bad debt losses. In support of this contention, plaintiff submitted the Certification of its Director, Credit/Legal, whose employment with plaintiff commenced six years after the Agreements went into effect. He concluded in his certification that plaintiff “bore the *29 economic burden for all debts” on the private label credit cards issued by the Finance Companies through the “financial arrangements” between plaintiff and the Finance Companies. He opined that the service fees plaintiff paid pursuant to these financial arrangements “presumably” enabled the Finance Companies to earn profits from issuing plaintiffs private label credit card and “presumably ensured” that the income realized by the Finance Companies from administering the private label credit card program exceeded the Finance Companies’ respective expenses, including bad debts. He described the service fee as “the result of negotiations between the parties [that] did not require a delineation of its components in the [AJgreements.”
The Vice-President of Risk Management for GE Consumer Finance, who described himself as having direct knowledge of the relationship between plaintiff and the Finance Companies and as having administered the private label credit card agreements between plaintiff and GE Capital and GE Finance, submitted a certification that included the following statements:
11 is my underxtanding that the Finance Companies projected the income that they would earn on customer accounts under the credit card agreements, including interest income, late fees, and service fees (also known as merchant discounts, which are percentage discounts charged to Home Depot for certain transactions). The Finance Companies also projected the anticipated costs to issue and service Home Depot’s private label credit cards, including anticipated bad debts, billing and collection costs, and administrative costs.
Under the credit card agreements, Home Depot bore the losses of anticipated bad debts by compensating the Finance Companies for those bad debts in advance through the income components of the [private label credit card] program. [Emphasis supplied.]
A principal of Ernst & Young, LLC, the accounting firm retained by plaintiff to prepare the refund claim at issue in this appeal, certified that he supervised the preparation of the claim and that the refund sought in the sum of $1,976,876.95 represents the actual tax paid with respect to uncollectible accounts for the Refund Period.
Plaintiff has acknowledged that the Agreements do not identify the components of the service fee or allocate the fee to any specific cost, expense, bad debt, or other loss incurred by the Finance Companies. As described in the certification of the Vice-Presi *30 dent of Risk Management for GE Consumer Finance, the service fee covered administrative costs and billing and collection costs, as well as anticipated bad debts. Plaintiff also has acknowledged that the component of the service fees representing anticipated bad debt losses by the Finance Companies could total more or less than the actual bad debt losses which are the bases for plaintiffs refund claim.
The Director asserts two grounds for granting her motion for summary judgment. First, she relies on the provisions of N.J.A.C. 18:24-23.2(a)(2) that deny any refund of sales tax where a vendor has collected from a customer an amount at least equal to the amount of sales tax payable. The Director argues that, under the express terms of the Agreements, plaintiff collected not less than 86.2% of the face amount of each private label credit card transaction, including applicable sales tax, even if the customer wholly defaulted on the credit card indebtedness. Second, the Director asserts that the service fees paid by plaintiff do not constitute bad debt losses suffered by a vendor under N.J.S.A. 54:32B—12(c) or N.J.A.C. 18:24-23.2(a), and thus, as a matter of law, cannot provide a basis for a sales tax refund.
In opposing the Director’s motion, plaintiff asserts that N.J.A.C. 18:24—23.2(a)(2) constitutes an unreasonable and invalid regulatory interpretation of N.J.S.A. 54:32B-12(c). Plaintiff claims that the Director’s determination, that payments by customers shall be applied first to sales tax, results in an increase in the effective sales tax rate to a rate far in excess of the 6% rate applicable during the Refund Period. Plaintiff also asserts that, under R. 4:46-2(a), the motion cannot be granted because genuine issues of material fact exist which require a full hearing for resolution. Specifically, plaintiff contends that it should be permitted to present proofs to explain how the service fees payable to the Finance Companies were calculated and to establish that, as a result of the payment of service fees, plaintiff bore the burden of bad debt losses incurred by the Finance Companies. Plaintiff contends that denying its refund claim would result in a revenue windfall to the Director because, if plaintiff had directly borne the credit risk with respect to its customers, it would be entitled to a *31 refund of sales tax paid with respect to purchases on which the customers defaulted. Plaintiff argues that it should not be treated any differently simply because it bore the bad debt losses indirectly rather than directly. Finally, plaintiff contends that denying its refund claim would constitute a denial of equal protection, a denial of due process, and a violation of the Commerce Clause of the United States Constitution.
For purposes of deciding the Director’s summary judgment motion, I must construe the facts most favorably to plaintiff and accord those facts all reasonably permissible inferences in plaintiffs favor. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 535, 666 A.2d 146 (1995). Accordingly, for purposes of deciding the motion, I find the following facts:
(1) the Agreements were in place and in effect during the Refund Period;
(2) the service fees under the Agreements ranged from zero to 13.8%;
(3) the service fees paid by plaintiff pursuant to the Agreements included an element repi’esenting projected bad debt losses to be incuired by the Finance Companies, although the portion of each service fee representing that element was not separately identified or quantified in any of the Agreements;
(4) plaintiff paid New Jei’sey sales tax of $1,976,876.95 with respect to private label credit cax’d sales of merchandise during the Refund Pei'iod as to which the credit card payment indebtedness was uncollectible; and
(5) all amounts due on the private label credit card purchases were payable to the Finance Companies, and, therefore, the Finance Companies directly bore all losses resulting from the customer defaults.
I will address first the Director’s contentions under N.J.A.C. 18:24-23.2(a)(2). As described above, this regulation includes a description of two circumstances involving uncollectible amounts in which sales tax refunds will be paid, N.J.A.C. 18:24-23.2(a)(l) and (3), but provides that, when the vendor collects an amount from a *32 customer at least equal to the tax payable with respect to the transaction, no refund will be paid. N.J.A.C. 18:24—23.2(a)(2). In suppoi’t of its contention that this provision is invalid because it distorts the effective rate of sales tax to a rate substantially higher than 6%, plaintiff cites the decision of the New York Court of Appeals in In re Abraham & Straws v. Tully, 47 N.Y.2d 207, 417 N.Y.S.2d 881, 391 N.E.2d 964 (1979). There, Abraham & Straus directly suffered bad debt losses in connection with credit extended to its customers. Id. at 881, 391 N.E. 2d at 965. Although regulations provided for the refund of sales tax paid with respect to uncollectible receivables, the New York Sales Tax Bureau and State Tax Commission took the position that, when the customer paid an amount sufficient to cover the amount of the sales tax, no refund was due. Id. at 881, 391 N.E. 2d at 966. This position was not supported by a regulation similar to N.J.A.C. 18:24-23.2(a)(2). The Court concluded as follows:
The statute and the regulation obviously intend that a vendor shall be relieved of sales tax liability to the extent that the receipt from a sale proves uncollectible, so that the taxes which the vendor is required to remit will most closely reflect the tax-due on moneys actually received on sales of personal property. The method employed by the bureau and approved by the commission, by which it is assumed that the first cash received by a vendor on a credit sale is for the entire sales tax due on the sale, would have quite the contrary result and, by reason of the fact that the receipts under consideration are by their nature not fully collectible, would inevitably produce a liability for sales taxes which would deviate from the statutory sales tax rate.
[Id. at 881, 391 N.E.2d at 966.]
This language reflects a rejection of the concept that the vendor, and not the taxing authority, should bear the entire credit risk with respect to a transaction. The holding of the New York Court of Appeals is not binding on me, and I respectfully disagree with the Court’s approach. I conclude that N.J.A.C. 18:24-23.2(a)(2) represents a reasonable and valid interpretation of N.J.S.A. 54:32B-12(e). See Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984) (stating, in a tax context, that the Director’s interpretation of a statute “is entitled to prevail, so long as it is not plainly unreasonable” (internal citations omitted)). It is reasonable for the Director to conclude that New Jersey, which has no ability to participate in the credit *33 evaluation of a particular customer, should not bear any of the credit risk relating to that customer. Thus, if a vendor receives an amount sufficient to pay the sales tax that would be due with respect to a transaction, the State of New Jersey is entitled to receive and retain that tax. If the vendor is unable to collect any additional monies from the customer, the vendor alone should suffer the consequences of its failure to evaluate properly the customer’s creditworthiness. Here, in each transaction included in its refund claim, plaintiff received, from one of the Finance Companies, a payment in an amount between 86.8% and 100% of the combined amount of the purchase price and sales tax due. Denying plaintiffs claim for refund under such circumstances is both fair and in accordance with the intent and purpose of the Sales and Use Tax Act. See N.J.S.A. 54:32B-12(b) (setting forth a presumption that sales tax is due and payable and placing the burden of establishing the contrary on the person required by the Act to collect taxes.)
Although the preceding analysis and conclusion is dispositive of the Director’s motion, I will address plaintiffs second basis for opposing the Director’s motion, namely, that a fact issue exists and plaintiff should have the opportunity to present further proofs as to the compensation for bad debt losses included in the service fees it paid to the Finance Companies. See Busik v. Levine, 63 N.J. 351, 364, 307 A.2d 571, appeal dismissed, 414 U.S. 1106, 94 S.Ct. 831, 38 L.Ed.2d 733 (1973) (permitting a court to “decide issues which need not be decided when it believes that course is warranted”). Plaintiffs contentions as to the existence of a fact issue are not supported by the certifications plaintiff submitted in opposition to the motion. None of the certifications contains any information identifying or quantifying the component of each service fee attributable to the bad debt losses anticipated by the Finance Companies, or describing how that component was determined, or discussing whether such a component actually was calculated or negotiated separately. The certifications assert conclusions unsupported by facts.
Plaintiffs Director, Credit/Legal certified that the service fees payable by plaintiff compensated the Finance Companies in ad *34 vanee for all credit losses and “presumably ensured” that the Finance companies would realize income greater than the expenses they incurred, including bad debt losses, in administering the private label credit cards for plaintiff. His only comment concerning the negotiations between plaintiff and the Finance Companies was his statement that the negotiations did not require a delineation of the components of the service fees. As noted above, this individual was not employed by plaintiff until six years after the date of the Agreements, and did not indicate in his certification the source of the information reflected in his certification. Consequently, his statements are speculation and hearsay.
The Vice-President of Risk Management for GE Consumer Finance asserted in his certification that he administered the private label credit card agreements between plaintiff and GE Capital and GE Finance, but stated that “it is my understanding” that the Finance Companies projected the income that they would receive under the credit card agreements and projected anticipated costs including bad debts, billing and collection costs, and administration costs. He provided no information as to the bases for his “understanding” and no information as to how the projections of income and costs were made or as to which portion of the service fees paid to GE Capital and GE Finance (ranging from 1.71% to 3.49% of the purchase price) was attributable to projected bad debts and which portion was attributable to billing and collection costs and administrative costs. His conclusions, therefore, are unsupported by facts and are hearsay.
Under R. 1:6-6, affidavits or certifications must set forth “only facts which are admissible in evidence.” As described above, the certifications submitted by plaintiff do not satisfy the requirements of the Rule because the certifications contain conclusions without factual support that constitute inadmissible hearsay as to the essence of plaintiffs contentions. The certifications, therefore, are insufficient to create a “genuine issue as to any material fact challenged” within the meaning of R. 4:46-2(e).
The reasons for the deficiencies in the certifications of plaintiffs Director, Legal/Credit and the Vice-President of Risk Manage *35 ment for GE Consumer Finance are suggested by findings made by the New York Division of Tax Appeals in a matter involving a claim for refund of sales tax under the identical agreements with Monogram and GE Capital that are at issue in this matter. In In re Home Depot U.S.A, Inc., DTA No. 821034 (N.Y. Div. of Tax Appeals May 17, 2007) (appeal pending), the Division made the following findings:
In consideration of the services provided to petitioner [ (Home Depot U.S.A., lire.) J, the credit card companies subtracted from all receipts a service charge. The service charge was not specifically defined in either the GECC or Monogram contract except to say that it was calculated in accordance with a formula set forth in an appendix. The parties to this matter stipulated that the service fees were determined by several factors, including the following: the bad debt experience of Home Depot’s credit card customers; the interest incurred that Monogram or GECC anticipated they would earn and that Home Depot forwent on the credit card account; the value of Home Depot’s credit card data base given to Monogram and GECC; and the administrative costs associated with the managed credit accounts by Monogram and GECC. However it is particularly noteworthy that neither the agreements nor the stipulation apportioned the percentages of the service fee among the various components and that petitioner conceded it could not determine if the actual bad debts written off by Monogram and GECC were equal to, greater than or less than the anticipated bad debt figure used to estimate the bad debt component of the service fee. In sum, petitioner did not demonstrate and acknowledged that it could not accurately account that it had compensated GECC or Monogram for the accounts which ultimately became uncollectible.
|In re Home Depot U.S.A., Inc., supra, DTA No. 821034.]
In this appeal, just as in the New York litigation, plaintiff has failed to identify the portion of the service fees representing compensation to the Finance Companies for their respective anticipated bad debt losses. Although counsel for plaintiff asserted in oral argument that plaintiff could present proofs quantifying that portion, none of the certifications plaintiff submitted in opposition to the Director’s summary judgment motion contained any factual or non-hearsay basis for such assertion. Because the New York Division of Tax Appeals cited a similar absence of proof in rejecting plaintiffs sales tax refund claims, plaintiff surely was on notice of the significance of such proofs. From plaintiffs failure to submit certifications identifying or quantifying the bad debt component of the service fees or describing the factors and process by which such component was determined, I infer that, in fact, no such identification or quantification was possible.
*36 Plaintiff has failed to establish, even on a prima facie basis, the relationship, if any, between the unmeasured, and apparently unmeasurable, component of the service fees representing the Finance Companies’ projected bad debt losses and the actual bad debt losses incurred by the Finance Companies with respect to the private label credit cards issued to plaintiffs customers. As a result, plaintiff has failed to demonstrate that it suffered any losses attributable to bad debts. It received payment in full from the Finance Companies for each transaction in which a customer used plaintiffs private label credit card, subject to deductions from some payments in the amount of the service fees (the service fees under the Monogram Agreement could be zero) and, perhaps, other items not relevant to this appeal. Whether or not the customer eventually defaulted on the credit card obligation, plaintiff received the same payment with respect to the transaction, and paid the same service fee.
Plaintiff has not identified or quantified, by percentage or aggregate dollar amount, the service fees it paid on the $32,947,949.17 in sales transactions that generated (at a tax rate of 6%) the $1,976,875.95 in sales tax which plaintiff seeks to have refunded. In any event, plaintiff does not contend that service fees paid with respect to these sales constituted the only service fees forming the basis for its refund claim. Plaintiff asserts that all service fees contained a bad debt component. As a result, plaintiff seeks a refund apparently based primarily on service fees paid where no bad debt loss occurred and the customer paid in full the credit card debt, including the merchandise charge and applicable sales tax. Neither N.J.S.A. 54:32B-12(c) nor N.J.A.C. 18:24— 23.2(a) contemplates a refund of sales tax where no bad debt loss has occurred. Thus, even if I were to assume (contrary to the actual situation described in plaintiffs certifications) that the service fees, in their entirety, were intended to cover anticipated bad debt losses, plaintiff could not prevail because: (1) no refund would be appropriate based on service fees allocable to private label credit card sales where no customer payment default occurred, and (2) plaintiff has not segregated the service fees paid with respect' to private label credit card sales where no default *37 occurred from the service fees paid with respect to private label credit card sales where a customer payment default did occur.
In short, plaintiffs response to the Director’s summary judgment motion is devoid of any factual submissions sufficient, even on a prima facie basis under the evidentiary standard applicable under R. 4:46-2(c), to demonstrate that its service fee payments constituted bad debt losses for which a sales tax refund is appropriate under N.J.S.A. 54:32I3-12(c) or N.J.A.C. 18:24-23.2. See Brill v. Guardian Life Ins. Co. of Am., supra, 142 N.J. at 540, 666 A.2d 146 (stating that “when the evidence ‘is so one-sided that one party must prevail as a matter of law* the trial court should not hesitate to grant summary judgment.”) (citation omitted). Plaintiff elected to use the services of the Finance Companies in order to enable its customers to make purchases using its private label credit card. Plaintiff is bound by tax consequences of that election. “It is not wrhat might have happened nor what the taxpayer could have done but what actually occurred that determines tax consequences.” General Trading Co., Inc. v. Director, Div. of Taxation, 83 N.J. 122, 138, 416 A.2d 37 (1980).
Plaintiff asserts that denying its refund claim would constitute treatment different from the treatment accorded to taxpayers who directly bear bad debt losses under circumstances where plaintiff contends that it, in effect, bore those losses. Plaintiff contends that such treatment would constitute a denial of equal protection of the laws and of substantive due process. Well-established law provides that, in determining whether a tax statute effects a denial of equal protection or due process, a court should apply a rational basis test and determine whether the legislation in question has a rational relationship to a legitimate governmental interest. See, e.g., Greenberg v. Kimmelman, 99 N.J. 552, 563-64, 494 A.2d 294 (1985); Town of Secaucus v. Hudson County Bd. of Taxation, 133 N.J. 482, 493, 628 A.2d 288 (1993) (stating that in the field of taxation, our Supreme Court “has accorded great deference to legislative judgments” and “has recognized that absolute equality in taxation is a practical impossibility” (citations omitted)). Our Supreme Court has recognized that, with respect to' tax laws, the Legislature possesses “the greatest freedom in classification.” *38 Salorio v. Glaser, 82 N.J. 482, 515, 414 A.2d 943 (1980) (quoting from Madden v. Kentucky, 309 U.S. 83, 88, 60 S.Ct. 406, 408, 84 L.Ed. 590, 593 (1940)).
These principles are applicable in determining whether the Director’s interpretation of N.J.S.A. 54:32B-12(c), as set forth in N.J.AC. 18:24-23.2(a), constitutes a denial of equal protection or a violation of due process. For the reasons set forth above, I conclude that the statute and the regulation are reasonable and have a rational relationship to a legitimate governmental interest. I further conclude that, insofar as the regulation distinguishes between a taxpayer that directly incurs a bad debt loss and one, such as plaintiff, which asserts that it has funded some portion of the bad debt losses incurred by a third party, the Director has established a rational, reasonable, and valid classification. As a result, denying plaintiffs refund claim does not result in an unlawful revenue windfall to the State of New Jersey. Plaintiff simply is paying sales tax on transactions on which it received at least 86.8%, and sometimes 97% to 100% of the combined amount of the purchase price and applicable sales tax.
Plaintiff also asserts that denying its refund claim would result in a violation of the Commerce Clause, but has failed to set forth any explanation or citation in support of this assertion. The argument is without merit, and I see no need to discuss it further.
For all of the foregoing reasons, I conclude that no genuine issues as to material fact exist in this matter and that the Director is entitled to judgment as a matter of law. Consequently, I grant the Director’s summary judgment motion and will enter judgment accordingly.

A "vendor'' is defined in N.J.S.A. 54:32B-2(i). The multi-part definition generally includes persons or entities making sales of tangible personal property or services, and does not include entities such as the Finance Companies that are not directly involved in making such sales.