MENYUK, J.T.C.
The issue in this case is whether plaintiffs sales of cookies and brownies at Giants Stadium and the Continental Airlines Arena within the Meadowlands Sports Complex in Secaucus, New Jersey are subject to sales tax under the Sales and Use Tax Act, N.J.S.A 54:32B-1 to -29 (the “Act”). Specifically, plaintiff contends that it is a licensee and not a lessee, that it therefore has no “premises,” and that its sales are not taxable under N.J.S.A. 54:32B-3(c)(1), pertaining to sales of food for consumption on the premises where sold. It further contends that it does not fall into any of the taxable categories of food sold for consumption off the premises of the vendor set forth in N.J.S.A. 54:32B-3(c)(3). For the following reasons, I conclude that plaintiffs sales are taxable sales of food for consumption on the premises where sold, and affirm the assessment of the defendant Director, Division of Taxation (the “Director”).
The plaintiff contests a final determination of the Director issued on April 9, 2002, upholding an assessment of sales tax in the amount of $96,557. With accrued interest (computed through August 20, 2002) and an amnesty penalty, see N.J.S.A. 54:53 — 18(b), the liabilities in issue total $171,671.35. The period for which the taxes were assessed is April 1, 1995 through March 31, 1999 (the “audit period”).
During the audit period, plaintiff was a franchisee of Mrs. Fields Cookies. Pursuant to a license agreement and subcontract dated as of September 1, 1992 (the “Subcontract”) with Harry M. Stevens, Inc. of New Jersey (“Stevens”),[1] plaintiff was granted a right to sell “or have featured” Mrs. Fields brand cookies and brownies at Giants Stadium, Brendan T. Byrne (now Continental Airlines) Arena (the “Arena”),[2] “and related property appurtenant *255 thereto ... including the dining facilities, corporate boxes and suites and press lounges located at such premises (the Locations).” [3] As described in more detail below, Stevens had been granted a general concession to sell food and beverages at the Meadowlands Sports Complex by the New Jersey Sports and Exposition Authority (the “Authority”).
Under the Subcontract with Stevens, plaintiff was authorized to sell Mrs. Fields cookies and brownies (1) at permanent concession stands allocated to plaintiff by Stevens; (2) from free-standing carts, the number and location of which were to be mutually agreed upon; (3) by means of vendors carrying food and beverages for sale; and (4) at other mutually agreed upon locations. The Subcontract specifically provided for a permanent concession stand for plaintiffs sales at the Arena. During the audit period, however, plaintiff actually sold cookies and brownies only from free-standing carts. The Subcontract expressly provided that no real or personal property was being leased to plaintiff under the Subcontract, and that plaintiff was a licensee and not a lessee. The parties further agreed that “any sale of Mrs. Fields ... cookies and brownies at such locations shall be deemed a sale by [plaintiff] and that [plaintiff] shall be responsible for all sales taxes attributable to such sales.”
Except for special events such as graduation ceremonies, admission to events at Giants Stadium and the Arena, and thus, access to plaintiffs products, required the purchase of a ticket. Notably, plaintiffs president and sole shareowner, William Bori, readily conceded that nobody comes to the Meadowlands to buy cookies or brownies. Rather, people come to see an athletic or other event staged at Giants Stadium or at the Arena and incidentally purchase cookies. Plaintiffs right to sell Mrs. Fields cookies and brownies, sometimes referred to in the Subcontract as a conces *256 sion, was applicable to all games, concerts, and events at the named locations, except as otherwise provided by the Subcontract or by agreements that Stevens had entered into with the Authority.
There are two principal agreements between Stevens and the Authority that are relevant here: first, an agreement entitled “Concession Agreement” dated August 28, 1975, pertaining to Giants Stadium and the Meadowlands Race Track (hereinafter the “Stadium Agreement”); second, an “Arena Concession Agreement” dated July 2,1981, pertaining to the Arena (hereinafter the “Arena Agreement”). There are amendments to each of these agreements, but they are relevant here only insofar as they extend the term of each of the agreements to a date subsequent to the audit period. Accordingly, the Stadium Agreement and the Arena Agreement, as amended (collectively, the “Agreements”), controlled the relationship between Stevens and the Authority. As provided in the Subcontract between plaintiff and Stevens, plaintiffs right to sell Mrs. Fields cookies and brownies was coextensive with the rights granted to Stevens under the Agreements, except where limited by the terms of the Subcontract itself.
Both Agreements recite that the Authority is responsible for the planning, design, construction and operation of the Meadowlands Sports Complex. According to Mr. Bori, the Meadowlands Sports Complex is owned by the State of New Jersey and managed by the Authority. But see N.J.S.A. 5:10 — 6(a)(1), authorizing the Authority “[t]o establish, develop, construct, operate, acquire, own, manage, promote, maintain, repair, reconstruct, restore, improve and otherwise effectuate” the project defined by N.J.S.A. 5:10-3(d) as the Meadowlands complex (emphasis added). See also Meadowlands Basketball Associates v. Director, Div. of Taxation, 19 N.J. Tax 85, 87 (2000), aff'd, 340 N.J.Super. 76, 773 A.2d 1160 (App.Div.2001) (noting that the Authority owned the Arena). Under the Agreements, the Authority granted to Stevens “the sole and exclusive Concession rights and privileges” at the specified facilities, including the right to sell and serve food and beverages.
*257 In the Agreements, the Authority undertook to furnish Stevens with adequate space for the proper operation of the concession rights. The Authority, however, reserved the right to elect to make changes to the Arena or the Stadium, and in connection with such changes to move all or any part of the space occupied by Stevens to a new location within the respective buildings or to change or alter any space occupied by Stevens. Finally, the Agreements provide that Stevens is liable for and will pay all federal, state, city, county and other taxes that might be assessed by virtue of its occupancy and operations on the premises.
The parties stipulated many of the facts pertaining to plaintiffs activities at the Meadowlands Complex, and there was also trial testimony regarding plaintiffs operations. According to Mr. Bori, his initial negotiations were with the Authority, and later with Stevens, with plaintiff eventually entering into the Subcontract with Stevens in 1992.
By the terms of the Subcontract, Stevens provided the employees used in plaintiffs operations. It also trained them and compensated them. Mr. Bori explained this was a requirement of Stevens’ union contracts. Mr. Bori and a single manager were plaintiffs only employees located at the Meadowlands Complex. Stevens’ employees baked the cookies and brownies, washed the baking sheets and utensils, cleaned up the baking area, transported the cookies and brownies from the baking area to the mobile carts used for selling, and sold plaintiffs products from the mobile carts.
Mr. Bori testified that the Mrs. Fields products were shipped by the distributor to the Meadowlands Complex, and upon receipt were placed by the distributor’s driver in a large freezer located in a room on the upper level of Giants Stadium. Mr. Bori was uncertain whether the freezer was owned by Stevens or the Authority, but it was not plaintiffs freezer. The cookie product was received by plaintiff in the form of individual frozen dough balls, packaged in plastic bags, with each bag containing fifteen balls. Each ball makes one cookie. All of Mrs. Fields’ franchisees receive Mrs. Fields cookie product in this form. Similarly, *258 the brownie product, which is also received frozen, is in a large sausage-shaped plastic casing and is the same product that is distributed to other Mrs. Fields’ franchisees. According to Mr. Bori, when the products are distributed to the franchisees in this manner, the cookies and brownies produced are consistent from franchise to franchise, and the consumer receives essentially the same cookie or brownie regardless of the franchise at which it is baked and purchased.
The Subcontract is silent as to any space to be made available to the plaintiff for preparation of its cookie and brownie products. Plaintiff has a baking facility in or near Section 301 of Giants Stadium. Plaintiff does not sell any products at that area and, from pictures admitted in evidence as a joint exhibit, the baking facility appears to be in an area that is not accessible to the general public. Mr. Bori testified that the baking area is not permanently assigned to plaintiff, and that if Stevens directs it to do so, plaintiff must move its baking equipment to another location. Plaintiffs equipment used in the baking area is not permanently installed and can be removed. The equipment consists of seven or eight portable ovens on wheels, portable baking racks and three or four stainless steel tables. Plaintiff also has baking trays and assorted baking utensils.
Prior to an event at one of the Meadowlands locations (for example, a football game at Giants Stadium), Mr. Bori or plaintiffs on-site manager notify Stevens of the number of its employees plaintiff will need to bake cookies and brownies and to sell them. According to Mr. Bori, Stevens sometimes makes available the number of employees that plaintiff has requested, and sometimes makes fewer employees available, apparently depending on Stevens’ own needs. Plaintiff does not request employees by name, and is not necessarily assigned the same employees from event to event, since under union rules, the employees rotate.
Plaintiffs manager tells the Stevens’ employee assigned as the baker how many cases of frozen cookie and brownie product will be needed for the event. For cookies, the baker removes the appropriate amount of product from the freezer and prepares it *259 for baking by opening up bags of individual frozen cookie dough balls and placing the balls on baking trays. The cookies are baked twenty minutes or so until done and are then removed from the ovens and cooled to room temperature. After the cookies are cooled, the trays with the cookies on them are wrapped in plastic, placed on hand carts and transported by Stevens’ employees to the selling carts. Mr. Bori testified that it is his policy to throw out any unsold cookies at the end of an event.
In the case of brownies, a Stevens employee removes from the freezer the amount of product that Mr. Bori or plaintiffs on-site manager has advised Stevens is required for the event. The frozen product is placed in the refrigerator overnight for it to defrost, and is baked the next day. After the brownies have been cooled, they are placed in a refrigerator for at least ten hours to “set.” They are then removed from the refrigerator, cut into serving size pieces, and placed on a gold tray for purposes of display. The brownies are sent out on a hand cart for a Stevens’ employee to transport to the selling carts. Mr. Bori testified that the brownies have a shelf life of three days and are thereafter discarded.
The cookies and brownies are sold from the carts in unsealed wax bags approximately seven inches by six inches with the Mrs. Fields logo on the front. The bags used by plaintiff are the same bags that are distributed by the franchisor to all of its franchisees in the United States. The cookies are sold two cookies to a bag, and the brownies are sold one brownie to a bag. During the audit period, two cookies had a sale price of $3.50 and brownies sold for $3.50 each.
During an event at Giants Stadium or at the Arena, Mr. Bori or plaintiff’s on-site manager checks the mobile selling carts, and if more cookies and brownies are needed, directs a porter to bring out more product. Mr. Bori or plaintiffs manager also directs porters to bring additional change to a cart when required. Stevens’ employees clean the carts after an event.
At the end of an event, plaintiffs manager collects the receipts from the Stevens’ employees who have manned plaintiffs selling *260 carts and deposits the receipts in plaintiffs bank account. Plaintiff sends a cheek to Stevens for the amounts due under the Subcontract (which are calculated as a percentage of plaintiffs gross receipts).
Plaintiff owns approximately thirty of the carts which are used to sell plaintiffs products. According to Mr. Bori, the carts are the only things “controlled” by plaintiff at Giants Stadium and the Arena. The carts are free-standing, have wheels and can be moved from location to location. They are plugged into electric outlets during events, permitting the canopies on which the Mrs. Fields logo appears to be illuminated. The cookies and brownies are kept at the ambient temperature while on the carts.
The carts are not assigned to permanent locations. Rather, Stevens tells plaintiff where its carts will be located for each event. Mr. Bori testified that, on occasion, the carts have been moved at the last minute to a less desirable selling location. Plaintiff is not permitted to maintain or repair its carts at the Meadowlands. In Mr. Bori’s words, “if we want to maintain our carts, we have to take them off premise.” He testified that he uses a trailer hooked up to his Jeep to remove the carts to his house to do repairs.
In addition to sales of Mrs. Fields cookies and brownies from the mobile carts, plaintiff also filled orders from Stevens for trays of baked products to be served in private boxes. Stevens was the caterer for all of the food and beverages served in the boxes, and the cost of the cookies and brownies were included in the catering bill given to the box customer by Stevens. These transactions were accounted for by plaintiff and Stevens as credits against amounts due by plaintiff to Stevens under the Subcontract. The Division treated these sales as nontaxable “sales for resale,” N.J.S.A. 54:32B-2(e)(l)(A), and the tax on these sales is not in issue here.
According to Mr. Bori, plaintiff collected and paid over to the Division of Taxation sales tax on the receipts from the sales of cookies and brownies from the mobile carts from 1992, the commencement of the Subcontract, through 1994. Mr. Bori testified *261 that at the end of 1994, he was negotiating the purchase of a franchise to sell Mrs. Fields baked products in two New Jersey shopping malls. In examining the books and records of those operations, he realized that the owners did not collect sales tax on cookies and brownies.
Mr. Bori contacted the Mrs. Fields organization, and was sent a copy of a letter dated April 4, 1986, from John Metzger, a tax counselor for the Division of Taxation, to Robert Neilson of Price Waterhouse, an accounting firm. The letter states that it was written in response to an inquiry from Mr. Neilson, who is not further identified. According to Mr. Bori, Mr. Neilson was an accountant used by the Mrs. Fields organization. In relevant part, the letter reads:
Your letter states that a taxpayer operates retail bakery type outlets. As a general rule stores are located in enclosed retail shopping malls. Their principal product is cookies (cookies comprise approximately 90% of total sales) .
Since the taxpayer does not consider its product for immediate consumption and does not intend to compete with such food product retailers, it positions its stores away from mall locations where food courts are provided which facilitate immediate consumption. There are not [sicj facilities for seating or food consumption on the premises.
Cookies, brownies, and muffins prepared by the taxpayer are priced by weights [sicj. Sales may be made in any quantity desired including by the dozen, half-dozen, or in larger quantities____
The New Jersey Administrative Code provides in part as follows:
Food or drink in an unheated state is not subject to tax when commonly sold in food stores in bulk, by weight, by the dozen (or part thereof) or by volume (gallon, quart, etc.) for off premises consumption.
[N.J.A.C. 18:24-12.3 example # 2 (4) ]
Based upon the facts submitted for review, it is the opinion of this office that (1) the sales by the taxpayer of baked goods including cookies, brownies [and] muffins ... are not subject to sales tax....
Mr. Bori testified that, upon receiving a copy of the foregoing letter, he became confused as to whether plaintiff should be collecting tax on the sale of cookies and brownies at Giants Stadium and the Arena. He therefore wrote a letter of inquiry to the Division of Taxation. Neither Mr. Bori nor the Division could locate a copy of his letter of inquiry. Neither party disputes that the response from the Division of Taxation, set forth in a letter *262 written by Denise Lambert, a tax services specialist, accurately sets forth the scope of Mr. Bori’s inquiry. Ms. Lambert’s letter to Mr. Bori, dated February 17, 1995, reads, in its entirety, as follows:
I am writing in response to your inquiry concerning the operation of a retail bake shop located at the New Jersey Meadowlands Sports Complex. You state that you sell cookies, brownies, muffins by quantity, as well as hot and cold beverages and novelty items
Baked goods sold and packaged for take-out are not subject to sales tax. Hot beverages and carbonated beverages are subject to tax. Noncarbonated beverages sold by the can or bottle are exempt from tax. Beverages sold by the fountain are taxable; milk is exempt from tax. The sale of tins of cookies is also exempt from tax.
According to Mr. Bori, after he received the letter from Ms. Lambert, plaintiff did exactly what the letter said, namely, it stopped collecting tax on the sale of baked goods in reliance upon advice contained in the letter.
It is plaintiffs position that the Subcontract specifically provided that no real or personal property was leased by Stevens to plaintiff, that plaintiff was a licensee only and that it had no “premises.” Rather, it asserts that its sales of food were for consumption “off the premises of the vendor,” that its cookies and brownies were sold in an unheated state, and that its products were of a type commonly sold in the same form and condition as food stores not principally engaged in selling prepared food. Consequently, plaintiff asserts that its sales were not subject to tax under N.J.S.A, 54:32B-3(c)(3).
Those provisions of N.J.S.A. 54:32B-3(c) which are relevant here, impose a sales tax on:
Receipts from the sale of food and drink in or by restaurants, taverns, vending machines or other establishments in this State, or by caterers ...:
(1) In all instances where the sale is for consumption, on the pi-emises where sold;
(3) In those instances where the sale is for consumption off the premises of the vendor, and consists of a meal, or food prepared and ready to be eaten, of a kind obtainable in restaurants as the main course of a meal, including a sandwich, except where food other than sandwiches is sold in an unheated state and is of a type commonly sold in the same form and condition in food stores other than those which are principally engaged in selling prepared foods[]
[emphasis added.]
*263 The Director contends that the “premises” referred to in N.J.S.A. 54:32B-3(c)(1) and (3), are Giants Stadium and the Arena, and that the receipts from sales of plaintiff’s products at Giants Stadium and the Arena are sales for consumption on the premises where sold. The Director relies on his regulation, N.J.A.C. 18:24-12.2, which defines the following terms:
“For consumption off the premises” shall mean that the food or drink is intended by the customer to be consumed at a place away from the vendor’s premises. “For consumption on the premises” shall mean that the food or drink sold may be immediately consumed on the premises where the vendor conducts his business.
1. In determining whether an item of food is sold for immediate consumption, there shall be considered the customary consumption practices prevailing at the selling facility.
“Premises” shall mean the total space and facilities in or on which the vendor conducts his business, including, but not limited to, parking areas for the convenience of in-car consumption, counter space, indoor or outdoor tables, chairs, benches and similar convenience fsie].
See also N.J.A.C. 18:24-12.3(a), which provides:
Sales tax is imposed on the receipts, including any cover, minimum, entertainment or other charge, or the value of a coupon, from every sale of food and drink of any nature sold in or by restaurants, taverns or other establishments in this State or by caterers:
1. In all instances where the sale is for consumption on the premises where sold;
2. In those instances where the sale is for consumption off the premises of the vendor and consists of a meal, or of food prepared and ready to be eaten, including sandwiches and other food or drink, unless the food and drink, other than sandwiches, is sold in:
i. An unheated state; and
ii. The same form and condition, quantities and packaging commonly used by food stores not principally engaged in selling foods prepared and ready to be eaten.
Plaintiff relies on a line of Ohio cases, commencing with Castleberry v. Evatt, 147 Ohio St. 30, 67 N.E.2d 861 (Ohio 1946), involving the taxability of sales of milk in paper containers through vending machines owned by a daily. The vending machines were located in an industrial plant and were patronized by plant employees. At issue was the interpretation of a constitutional amendment exempting from tax “the sale or purchase of food for human consumption off the premises where sold.” The taxing authority contended that the entire building in which the machines were located constituted “the premises.” The court reasoned, *264 however, that the sale of milk off the premises of the vendor had not been taxable prior to the amendment, and that the intent of the amendment was to broaden and not narrow any existing exemption. “The particular purpose of the amendment seems to have been to tax only sales of food which is sold and served in restaurants or other similar places under the control of the vendor.” Id. at 863 (emphasis added). The court expressed its belief that, if the taxing authority’s position were logically extended, it would require the taxation of sales of bread and milk delivered at the door of the customer, and of sales by retail grocers who deliver to the their customers because “those sales too are completed and consummated on the premises of the purchaser and would be sales of food for consumption on the premises where sold.” The court accordingly affirmed the decision finding the vending machine sales to be exempt from tax.
The Castleberry case served as the basis for decision in Cleveland Concession Co. v. Peck, 159 Ohio St. 480, 112 N.E.2d 529 (Ohio 1953), where the issue was the taxability of sales of food at concession stands and by vendors in the grandstands of Cleveland Municipal Stadium under agreements with the City of Cleveland and the Cleveland Baseball Club. The court concluded that, because the vendors did not have control of the premises at the points where purchases were made, the sales were exempt from tax. Id. at 531.
In a later administrative decision, Cleveland Stadium Corp. v. Limbach, No. 83-C-407, 1986 Ohio Tax LEXIS 160 (Ohio Bd. Tax Appeals Aug. 5, 1986), the issue was also the sale of food at concession stands and by vendors roaming the stands inside the stadium. The plaintiff, Cleveland Stadium Corp., managed and operated the stadium under a lease from the City of Cleveland, and subleased the stadium to a professional football franchise and a professional baseball franchise. As part of the subleases, the teams were given the exclusive right to occupy spectator areas, including seating areas, concourses, ramps and so forth, at game time. The plaintiff contended that it therefore had no control over the areas in which the food was consumed during the times in which sales of food were made.
*265 The Ohio Tax Commissioner relied on a statutory amendment enacted following the Castleberry and Cleveland Concession Co. eases, which defined “premises” as any real property upon which a person engages in malting retail sales, including any real property designated for or devoted to use in conjunction with the business of the taxpayer. The Board concluded that the statute, as amended, while not requiring a proprietary interest in or control over the premises, was intended only to reach sales where the purpose of the entire operation was to provide food, and not situations where the sale of food was secondary to watching football and baseball games. The Ohio Board of Tax Appeals has since reverted to the “control of the premises” rationale. See Progressive Food Mgmt, Inc. v. Tracy, No. 91-K-1315, 1994 Ohio Tax LEXIS 14 (Ohio Bd. Tax Appeals Jan.14, 1994); Sobieck v. Tracy, No. 93-M-329, 1994 Ohio Tax LEXIS 1335 (Ohio Bd. Tax Appeals Aug.12, 1994).
In addition to the Ohio cases, plaintiff cites cases from other jurisdictions that have incorporated, to a greater or lesser degree, an inquiry as to whether the vendor had control of the premises. See Canteen Corp. v. Dept. of Revenue, 123 Ill.2d 95, 121 Ill.Dec. 267, 525 N.E.2d 73, 80 (1988); Treasure Island Catering Co. v. State Bd. of Equalization, 19 Cal.2d 181, 120 P.2d 1, 6 (1941).
The parties agree that this is a case of first impression in this state, and that it turns on the definition of the term “premises.” The only published case that has considered the meaning of N.J.S.A. 54:32B-3(c) is Automatic Merchandising Council of N.J. v. Glaser, 127 N.J.Super. 413, 317 A.2d 734 (App.Div.1974). There, the Appellate Division invalidated a regulation which had the effect of taxing vending machine sales of carbonated beverages, hot drinks, sandwiches and other prepared food, holding that the regulation amounted to an impermissible amendment of the statute by way of regulation, where there was a specific exemption for vending machine sales contained in the Act. Id. at 418, 317 A 2d 734. In addressing the Director’s argument that vending machine sales of prepared food were equivalent to sales by a restaurant, the court applied the rule of ejtisdem generis, and found that a vending machine was not similar to a restaurant or tavern and therefore, could not be included within the term “or *266 other establishments” contained in N.J.S.A. 54:32B-3(c)(1). Although the definition of the term “premises” was not directly-implicated in the case, the court additionally stated:
[E]ven if we were to bypass the foregoing rules of construction, sales through coin-operated vending machines are not encompassed within any of the paragraphs of subsection (c). Paragraph (1) refers to sales for consumption on the premises where sold. The term “the premises where sold” must logically refer to the preceding term “the sale of food and drink ... in or by restaurants, taverns or other establishments,” and thus to the establishment which sells the food or drink. Here this would have to refer to the vending machine itself, and not to the premises owned by others upon which the vending machine is situated. Again, such sales cannot be considered to be “for consumption on the premises.”
[Id. at 419, 317 A.2d 734.]
In a later case, Automatic Merchandising Council of N.J. v. Glaser, 166 N.J.Super. 411, 400 A.2d 62 (App.Div.), certif. denied, 81 N.J. 267, 405 A.2d 812 (1979), the Appellate Division again rejected the Director’s contention “that food sales in or by restaurants and taverns are so similar to sales through vending machines that the latter should be subsumed thereunder.” Id. at 65. The latter decision was based, in part, on the Legislature’s failure to act following the decision in the earlier case. The Legislature did eventually act. See Assembly Taxation Committee Statement to A. 3422, subsequently enacted as L. 1979, c. 274, codified at N.J.S.A 54:32B-3(c)(4), which explained:
This legislation has become necessary as a result of the recent court decision which was handed down in Automatic Merchandising Council of New Jersey v. Sidney Glaser, Director of Taxation, 166 N.J.Super. 411, 400 A.2d 62 (1979)....
The court found that the current statute does not apply to prepared foods which are purchased through a coin-operated vending machine for on premises consumption. The same prepared food item, however, is subject to tax if purchased other than through a coin-operated vending machine. The fact that a coin-operated vending machine is used as the mode for purchasing the prepared food item should not constitute a basis for authorizing an exemption of the prepared food from the sales tax. Accordingly, this legislation would rectify that inequity so that the sales tax is imposed similarly on all prepared food items.
Neither party here relies on the Automatic Merchandising Council cases, and the subsequent amendment of the Act and its legislative history are unclear as to precisely what aspects of the Appellate Division’s decisions the Legislature intended to overrule.
*267 The parties here have, in effect, asked the court to determine whether the word “premises” as used in N.J.S.A. 54:32B-3(c) should be defined broadly as the total space and facilities in or on which the vendor conducts his business, as set forth in the Director’s regulation, N.J.A.C. 18:24-12.2, or narrowly, to require control of the premises on which the vendor is located, as in the Ohio cases relied upon by plaintiff and, inferentially, in dicta in Automatic Merchandising Council of N.J., supra, 127 N.J.Super. at 419, 317 A.2d 734. The general principles applicable to the determination of the appropriate construction of N.J.S.A. 54:32B-3(c) are well-settled.
First, the plain language of the statute must be considered, giving that language its ordinary or general meaning as long as that meaning comports with the statute’s legislative intent. Koch v. Director, Division of Taxation, 157 N.J. 1, 7, 722 A.2d 918 (1999). If the statute is clear on its face, a court should not delve deeper. Ibid.
Plaintiff advocates an interpretation of the term “premises” consistent with what is conveyed with a license to define the limits of its premises. Plaintiff cites Webster’s Third New International Dictionary 1304 (2002) for the following definition of license:
[Authority or permission of one having no possessory rights in land to do something on that land which would otherwise be unlawful or a trespass— distinguished from a lease.
Plaintiff thereafter states that Webster’s defines “possessory” as related to “possession,” which is defined as:
[Alctual physical control or occupancy of property by one who holds for himself and not as a servant of another without regard to his ownership and who has legal rights to assert interests in the property against all others having no better right than himself.
[Id. at 1770.]
According to plaintiff, the only things over which it has control are the carts from which its products are sold, and that its customers obviously do not eat the cookies and brownies on the carts or even while standing immediately adjacent to the carts. Rather, they eat the baked goods in other areas of Giants Stadium or the Arena (such as their assigned seats) or remove them from the Meadow-lands Complex at the end of an event.
*268 The question before the court, however, is not the definition of “license” but of the statutory term “premises,” which Black’s Law Dictionary (8th ed.2004) defines in relevant part, as:
2. The part of a deed that describes the land being conveyed, as well as naming the parties and identifying relevant facts or explaining the reasons for the deed.
3. A house or building, along with its grounds____
Blacks Law Dictionary continues its definition of “premises” by quoting Bryan A. Garner, A Dictionary of Modern Legal Usage 685 (2d ed.1995), as follows:
Premises (= a house or building) has a curious history in legal usage. Originally, in the sense of things mentioned previously, it denoted the part of a deed that sets forth the names of the grantor and grantee, as well as the things granted and the consideration. Then, through hypallage [4] in the early 18th century, it was extended to refer to the subject of a conveyance or bequest as specified in the premises of the deed. Finally, it was extended to refer to a house or building along with its grounds. In short, someone who says, “No alcohol is allowed on these premises,” is engaging unconsciously in a popularized legal technicality.
The ordinary or general meaning of the term “premises” is demonstrated by Mr. Bori’s own testimony in which he described the removal of plaintiff’s selling carts “off premise,” meaning outside the Meadowlands Complex, for repair, and in his responses during cross-examination as to the meaning of the word “premises” as used in the paragraph of the Subcontract granting the concession:
Q. What is your understanding ... of the words “at such premises?"
Mr. Sukel: Objection, Your Honor. It’s not a defined term in the contract. It’s not a defined term here.
Ms. Brown: I’m asking what is his understanding of the term “at such premises.” This is his sublicense agreement with [Stevens] at the time.
The Court: I’m going to overrule the objection, Mr. Sukel, and allow the question.
Witness [Mr. Bori]: I would i;ead such premises location that [Stevens] was granting me a license to operate and sell my product in those buildings that they have the right to grant me the license to operate in.
Q. And were those buildings the premises?
A. Well, it says, “located at such premises locations,” and above it, it says the names of the buildings, so I’m assuming it was the same buildings, yes.
*269 Q. So the entire buildings were the premises?
The Witness: I guess the whole buildings were [theirl premises.
Q. And were the related property appurtenant thereto the premises?
A. Yes, the premises.
I conclude that the Director’s interpretation of the term “premises” as the total space in or on which the vendor conducts his business, is consistent with the ordinary meaning and usage of the term. The issue then becomes whether the plain meaning comports with the legislative intent. Koch, supra, 157 N.J. at 7, 722 A.2d 918.
“[T]here is a dearth of legislative history behind the enactment of the sales tax ...” N.J. Bell Tel. Co. v. Director, Div. of Taxation, 152 N.J.Super. 442, 447, 378 A.2d 38 (App.Div.1977), certif. denied, 75 N.J. 594, 384 A.2d 824 (1978). As noted above, there has been little judicial consideration given to the appropriate construction of N.J.S.A. 54:32B-3(c).
Plaintiff contends that the Legislature established the general principle that food sold for consumption on the premises, such as in restaurants, or food sold as catered meals is taxable, but that the Legislature created an exemption for food sold for “off premises” consumption in an unheated state and in the same form and condition as that sold in food stores. Plaintiff asserts that, based on its understanding of the legislative intent, its sales are exempt because its cookies and brownies are consumed off the premises of the seller, that is, the cookies are not consumed on or at the mobile carts from which they are sold. The difficulty with that explanation is its circularity: it assumes that the Legislature ascribed the same meaning to the term “premises” as plaintiff does. As already discussed, that meaning is not the ordinary and common meaning.
The Director asserts that the Legislature generally imposed a tax on “[t]he receipts from every retail sale of tangible personal property, except as otherwise provided in this act.” N.J.S.A 54:32B-3(a). Food is tangible personal property, and receipts from sales of all food would be taxable but for the exemption provided by N.J.S.A 54:32B-8.2, which exempts sales of food and *270 beverages sold for consumption off the premises where sold, but not including candy and confectionary or carbonated beverages, which are taxable. The exemption is inapplicable to food and drink subject to tax under N.J.S.A 54:32B-3(c). According to the Director, ‘N.J.S.A. 54:32B-8.2 was enacted to minimize the tax burden on persons purchasing groceries in contrast to restaurant or ‘convenience’ food” that is taxable under N.J.S.A 54:32B-3(c)(1), (2) and (3), which subsections reflect the Legislature’s intent to tax food with a luxury, service or convenience element associated with it.
The Director’s explanation is reasonable. The Director correctly notes that it is the general scheme of the Act to tax all sales of tangible personal property unless they are otherwise specifically exempted by the act. N.J.S.A 54:32B-3(a). “Only sales of specifically enumerated services are subject to tax. N.J.S.A. 54:32B-3(b).” Williams Termite and Pest Control, Inc. v. Director, Div. of Taxation, 18 N.J. Tax 444, 446 (1999). N.J.S.A. 54:32B-3(c) appears to include sales of specific types of tangible personal property, namely food and beverages, combined with a service, which service may be the preparation of the food or making available food at a site where the customer wishes to consume it, or both.
That N.J.S.A. 54:32B-3(c) was intended to tax a customer on the sale of goods enhanced with a service performed for the customer is a reasonable interpretation of the statute. The sales tax is, after all, a tax on the customer, not on the vendor. N.J.S.A. 54:32B-12(a). Further, “it shall be presumed that all receipts for property or services of any type mentioned in subsections (a), (b) and (c) of section 3 [N.J.S.A. 54:32B-3(a), (b) or (c) ] ... are subject to tax until the contrary is established, and the burden of proving that any such receipt ... is not taxable hereunder shall be upon the person required to collect tax or the customer.” N.J.S.A 54:32B-12(b). The taxpayer has the burden of proving that its sales fall outside the statute’s coverage. See L. & L. Oil Service, Inc. v. Director, Div. of Taxation, 19 N.J. Tax 390, 400 (2001) (discussing whether a service is taxable under N.J.S.A. 54:32B-3(b)).
*271 The Director is given broad powers to adopt rules appropriate to the carrying out of the Act. N.J.S.A. 54:3213-24(1). Moreover, the Director’s interpretation of the operative law is entitled to prevail, as long as it is not plainly unreasonable. Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 327, 478 A.2d 742 (1984). Courts generally accord substantial deference to the interpretation of a statute by the agency charged with enforcing it. Koch, supra, 157 N.J. at 8, 722 A.2d 918; GE Solid State, Inc. v. Director, Div. of Taxation 132 N.J. 298, 306, 625 A.2d 468 (1993). Of course, courts remain the final authorities on issues of statutory construction. Koch, supra, 157 N.J. at 8, 722 A.2d 918. Regulations that “flout the statutory language and undermine the intent of the Legislature” have been invalidated. GE Solid State, Inc., supra, 132 N.J. at 306, 625 A.2d 468.
In this case, I conclude that the Director’s regulations, N.J.A.C. 18:24-12.2 and -12.3(a), as applied to make plaintiffs sales of cookies and brownies taxable because they are sold for consumption on the premises, comport with the plain language of the statute, are consistent with the legislative intent, do not flout the statutory language or undermine the intent of the Legislature, and are reasonable.
Moreover, I am not persuaded by the reasoning of the authorities relied upon by the plaintiff. The control of the premises rationale permits the vendor to decide whether a sales transaction is taxable, depending upon the type of agreement the vendor has entered into for use of another’s property. It is unlikely that the Legislature intended such a result.
The Authority, whether it owns or merely operates the Mead-owlands Complex, clearly would be obligated to collect sales tax if it directly sold food to patrons of Giants Stadium and the Arena, since there is no exemption from the tax for sales by a public entity when is sells services or property of a kind ordinarily sold by private persons. N.J.S.A. 54:32B-9(a)(l) (Exempt Organizations). The food would be sold for consumption on the Authority’s premises. As the prefatory recitations to the Agreements make clear, the Authority wanted food to be provided to patrons of the *272 Meadowlands Complex: the Agreements state that the Authority desired that Stevens, an experienced caterer at sports facilities, conduct the concession. The Authority cannot contract away the subjectivity to the sales tax of receipts from the sales of food on its premises by giving Stevens a concession to sell food. The Agreements recognize that principle by providing that Stevens is liable to pay all taxes that might be assessed by virtue of its occupancy and operations on the premises. Similarly, under the Subcontract, plaintiff agreed to be liable for all taxes that might be assessed against it or that were attributable to it by virtue of its occupancy and operations under the Subcontract. Although the parties to the various agreements can agree as to how the liability for taxes will be assumed as among themselves, they cannot negate the statutory provisions entirely. Nor do I read the Agreements and the Subcontract to intend that result.[5] Under the facts of this case, the Director’s construction of the statute and the application of his regulations were entirely reasonable.
As a further reason to reject the Director’s regulations, plaintiff lists a “parade of horribles” that might occur should the court adopt the Director’s definition of the term “premises.” Among other examples cited by plaintiff are denials of exemptions for charitable organizations using only part of an otherwise commercial property, and expansion of dram shop liability to vendors at sporting events for accidents and injuries in parking lots. As for charitable exemptions, the rules are set forth by statute, not by case law defining premises in another statute which is not in pari materia. N.J.S.A. 54:4-3.6. With respect to dram shop liability, at least one jury has already concluded that such liability exists. See Henry Gottleib, Jury Duns Stadium Beer Vendor $105M for *273 Paralysis Caused by Drunken Fan, 179 N.J.L.J. 237 (Jan. 24, 2005). As for the remaining “horribles,” I have no doubt that the courts of this state can distinguish this case, which is limited to the interpretation of the term “premises” in the context of the Act and, more particularly, in the context of a particular section of the Act.
Plaintiff alternatively contends that the Director’s regulation listing establishments required to collect tax on the sale of food for consumption on or off the premises, failed to include arenas and stadiums until after the assessment period in issue here, and emphasizes that the regulation, N.J.A.C. 18:24-12.3(b), was not amended to include arenas and stadiums until after the complaint in this case had been filed. It therefore asserts that the Director failed to comply with the requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 to -15, that the assessment here constitutes de facto rule-making, and that the assessment should be voided.
I conclude that the definitions of “premises,” “for consumption off the premises,” and “for consumption on the premises” contained in N.J.A.C. 18:24-12.2, and the provisions of N.J.A.C. 18:24-12.3(a), all of which were in effect during the audit period, plainly set forth the obligation to collect the tax. Further, the listing of examples of the types of establishments required to collect the tax set forth in N.J.A.C. 18:24-12.3(b) was explicitly not inclusive, and the Director was not required to amend it before assessing the tax in issue here.
N.J.A.C. 18:24-12.3(b) provides that “[t]he following establishments, as well as other establishments engaged in the sale of food and drink for consumption on or ojf premises, are required to collect the tax,” followed by specific examples of such establishments, such as cafeterias, carry-out restaurants, delicatessens, fast food operators, oyster and clam bars, and so forth (emphasis added). During part of the period in issue here, April 1, 1995 to June 1, 1998, the list included twenty-five or so different types of establishments. Effective June 1, 1998, the regulation was amended to add sushi bars to the list. 30 N.J.R. 2070(b) (June 1, *274 1998). Effective August 18, 2003, the regulation was again amended, to add “food vendors in offices, factories and other work places,” “mall food courts,” “juice bars” and “sports/entertainment arena food vendors.” 25 N.J.R. 3848(a) (Aug. 18, 2003). The latter amendment was made after the filing of the complaint in this action.
In Metromedia, Inc., supra, 97 N.J. at 331, 478 A.2d 742, the Court enumerated six factors “all or most of’ which, when present, weigh in favor of a conclusion that the agency should engage in the rule-making process. Rule-making is indicated when the administrative determination: (1) is intended to have coverage encompassing a large segment of the regulated or general public; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate prospectively; (4) prescribes a directive that is not obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that was not previously expressed in any official and explicit agency pronouncement or if the policy constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision in the nature of the interpretation of law or general policy. Id. at 331-32, 478 A.2d 742.
The Director’s assessment of tax here does not reflect a new administrative policy, or a change in policy. The Director’s interpretation of the statute was clearly reflected in N.J.AC. 18:24-12.2 and -12.3(a). That plaintiff was on notice of and understood those regulations is evidenced by Mr. Bori’s acknowledgment that plaintiff collected the tax on its sales of cookies and brownies until it received Ms. Lambert’s February 1995 response to plaintiffs inquiry. The 2003 amendment of N.J.A.C. 18:24 — 12.3(b) to include the example of “sports/entertainment ai’ena food vendors” to the already lengthy list of examples set forth in the regulation changed nothing of substance. The operative rules, N.J.A.C. 18:24-12.2 and -12.3(a), were effective during the entire audit period, and the failure to include sports/entertainment arena food vendors among the examples listed in N.J.A.C. 18:24-12.3(b) did not constitute a violation of the Administrative Procedure Act. *275 The Director’s action did not constitute a rule and the assessment did not constitute ad hoc rule-making. The action taken here constituted the enforcement of existing rules.
Finally, plaintiff claims that, should the court determine that it is liable for the sales tax, it should be relieved of the interest and penalties assessed against it pursuant to N.J.S.A. 54:49-11(b), because it relied on the written advice given to it by Ms. Lambert in 1995.
N.J.S.A. 54:49 — 11(b) provides:
The director shall waive the payment of any part of any penalty or any part of any interest attributable to the taxpayer’s reasonable reliance on erroneous advice furnished to the taxpayer in wi'iting by an employee of the Division of Taxation acting in the employee’s official capacity, provided that the penalty or interest did not result from a failure of the taxpayer to pn'ovide adequate or accurate infomation.
[emphasis added.]
Prior to July 1, 1993, the effective date of L. 1992, c. 175, § 4, codified as N.J.S.A. 54:49-11(b), taxpayers relying on erroneous advice from the Division of Taxation had little recourse when the Division of Taxation later made an assessment contrary to the earlier information. Williams Termite and Pest Control, Inc., supra, 18 N.J. Tax at 450. See Black Whale, Inc. v. Director, Div. of Taxation, 15 N.J. Tax 338, 353-56 (1995) (collecting cases generally holding that estoppel does not apply against the Division). Taxpayers are now relieved from the payment of interest and penalty, but only where (1) an authorized Division employee provides written advice; (2) the advice is based on adequate and accurate information from the taxpayer; (3) the advice is erroneous; and (4) the taxpayer has reasonably relied on the advice. L. & L. Oil Service, Inc., supra, 19 N.J. Tax at 406; Tischler v. Director, Div. of Taxation, 17 N.J. Tax 283, 296 (1998).
I conclude that there was no reasonable reliance by the taxpayer on Ms. Lambert’s letter because plaintiffs inquiry was wholly lacking in information sufficient to inform the Division of Taxation as to its actual operations. Plaintiffs letter advised the Division that it operated a retail bake shop located at the New Jersey Meadowlands Sports Complex. This characterization strongly *276 implies that plaintiff had an actual, single non-mobile location with regular hours for conducting business, and that no admission fees were charged to gain entry to the shop. It does not inform the Division that plaintiff had an area for baking on an upper level of Giants Stadium and that its sales were made from thirty or so mobile carts located in Giants Stadium and the Arena only when those venues were open for events, and that patrons had to pay a fee in order to reach plaintiffs place of business.
It appears that Mr. Bori’s letter was modeled after the earlier request for information regarding Mrs. Fields franchises located in enclosed shopping malls and was intended to elicit the same advice. The attempt was successful in that Mr. Bori apparently received the advice he was seeking. It was erroneous, however, as applied to the actual facts of plaintiffs operation. If, as Mr. Bori testified, he was truly confused over the difference in the rules for collection of sales taxes by franchisees operating in shopping malls, and the rules he himself had been following for sales in Giants Stadium and the Arena, he would have made the distinction clear in his letter of inquiry. I conclude that plaintiff is not entitled to have interest and penalty waived pursuant to N.J.S.A. 54:49-11(b).
For the foregoing reasons, the Director’s assessment is affirmed.

 Stevens was later succeeded by an entity identified by plaintiff’s president as Aramark but the Subcontract was in effect at all times during the audit period in issue. At trial, plaintiff’s president referred to the entity with which plaintiff had contracted as both Stevens and Aramark.

 The agreement also included the right to sell the same products at the Meadowlands Race Track and Monmouth Park Race Track. Only plaintiffs *255 operations at Giants Stadium and the Arena were at issue during the Audit Period.

 Plaintiff was also granted the right to sell certain beverages. Plaintiff apparently collected any tax that was due on such sales, and it is only the tax on cookies and brownies that is in issue here.

 "Hypallage” is "a figure of speech in which the proper subject is displaced by what rightfully would be the object.” Bryan A. Garner, A Dictionary of Modern Legal Usage 410 (2d ed.1995).

 Arguably, Stevens, whose employees baked and sold the cookies and brownies, could be regarded as the vendor and the person required to collect the tax. N.J.S.A. 54:32B-2(i) (defining "vendor"); N.J.S.A. 54:32B-2(w) (defining persons required to collect the tax). It is clear from the Subcontract and the course of dealing between plaintiff and Stevens, that the parties intended for Stevens to act as plaintiff's agent when it sold plaintiff's products. Unlike the cookies and brownies sold by plaintiff to Stevens for Stevens' use in providing food to the private boxes, plaintiff did not sell the baked products sold from mobile carts to Stevens. All receipts were turned over to plaintiff by Stevens' employees.