**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1331-17T3

PRESERVE II, INC.,

     Plaintiff-Appellant,

v.

DIRECTOR, DIVISION OF
TAXATION,

     Defendant-Respondent.

_____

PULTE HOMES OF NJ, L.P.,

     Plaintiff/Cross-Respondent,

v.

DIRECTOR, DIVISION OF
TAXATION,

     Defendant-Respondent/
     Cross-Appellant.

_____

PULTE COMMUNITIES OF NJ,
L.P.,
     Plaintiff/Cross-Respondent,

v.

DIRECTOR, DIVISION OF
TAXATION

    Defendant-Respondent/
    Cross-Appellant.

_____

Argued October 10, 2019 – Decided September 9, 2020

Before Judges Fuentes, Haas and Mayer

On appeal from the Tax Court of New Jersey, Docket Nos. 010921-2013, 010920-2013, 010922-2013, whose opinion is reported at 30 N.J. Tax 133 (2017).

Leah Robinson argued the cause for appellant/cross-respondent (Mayer Brown LLP, attorney; Leah Robinson, on the briefs).

Michael J. Duffy, Deputy Attorney General, argued the cause for respondent/cross appellant (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Michael J. Duffy, on the brief).

PER CURIAM

Plaintiff, Preserve II, Inc., is a foreign corporation with limited partnership interests in Pulte Homes of NJ, L.P. (Homes), and Pulte Communities of NJ, L.P. (Communities), two partnerships that built and sold homes in New Jersey. The Director of the Division of Taxation (Director) began an audit of plaintiff's tax returns in 2010. On April 5, 2013, while the audit was

2

pending, plaintiff applied for a tax refund of $2,084,656 for tax-years 2005 through 2007, based on an absence of nexus to this State. On April 11, 2013, the Director made its final audit determination and determined plaintiff owed $5,429,385.38 in outstanding taxes.

On April 19, 2013, the Director separately assessed against Homes and Communities $2,126,591.02 and $2,511,382.88, respectively, in outstanding taxes for 2005 through 2010, and thereafter denied plaintiff's claim for a refund. Plaintiff, Homes, and Communities (cross-respondents) each filed separate complaints in the Tax Court challenging the Director's assessments. Judge Mala Sunder consolidated the complaints and presided over a three-day trial that began on March 28, 2016 and ended on March 30, 2016. The judge heard testimony from a total of five witnesses, including two Director employees.

On October 4, 2017, Judge Sunder issued an opinion published in the Tax Court Reports, in which she affirmed the Director's assessments of the corporate business tax (CBT) as well as the decision to deny a tax refund. Judge Sunder also reversed the Director's assessments against cross-respondents. Pres. II, Inc. v. Dir., Div. of Taxation, 30 N.J. Tax 133 (Tax 2017). The parties stipulated that if plaintiff's CBT assessments were upheld, cross-respondents would not be subject to additional taxation. Id. at 175.

In this appeal, plaintiff argues that New Jersey's statutes and regulations prohibit the imposition of the CBT on a foreign corporation whose only connection to New Jersey is its passive investments in limited partnerships over which it had no control. Plaintiff contends that Judge Sunder misapprehended the corporate structure of the entities at issue, which affected her legal analysis. We disagree and affirm. The Tax Court correctly construed the relevant statutory scheme and its findings concerning the corporate structure were both legally sound and supported by the record. The record supports Judge Sunder's finding that plaintiff derived receipts from New Jersey sources and had a sufficient nexus to the State during the relevant tax years to subject it to the CBT for income it derived from those partnerships.

I.

The basic corporate structure of the entities at issue are not in dispute. Throughout the audit years, Pulte Group, Inc. (Pulte), a publicly traded holding company, registered and headquartered in Michigan[1] was the "apex parent" at the top of the corporate hierarchy that owned approximately 200 subsidiaries. Plaintiff's counsel read into evidence the deposition testimony of Vincent Frees,

---

[1] Pulte moved its corporate headquarters to Georgia in 2014, after the audit period.

Pulte's vice-president and "controller." Frees characterized his role and affiliation as "an officer of the parent company." Thus, although Pulte did not have employees in the conventional understanding of the word, it pursued two types of business endeavors during the audit years: homebuilding (its core business) and financial services.[2]

The majority of the subsidiaries, including Pulte Home Corporation (PHC), were engaged in some form or aspect of homebuilding. In Pulte's corporate structure, plaintiff was a holding company investing in homebuilding. However, for tax reporting purposes, plaintiff was placed in the homebuilding line of Pulte's businesses. Bruce Robinson, the treasurer for all of the entities involved, testified that in order to comply with the reporting requirements of the Securities and Exchange Commission (SEC), plaintiff was considered to be in the homebuilding rather than the financial services line of business. The following portion of Robinson's trial testimony clarifies this issue:

> Q. So the two lines that you considered the consolidated group to be engaged in are home building and financial services. What would you describe as financial services?

---

[2] According to Frees, "financial services" encompassed "a mortgage company, and several other title companies and also different operations internally, Puerto Rico, Mexico. Over the course of the audit period, there was a lot of countries as well."

A. Our financial services are predominantly our mortgage operations and they also manage title insurance operations for the company as well.

Q And when you think of the group, is your view that every entity is going to fall into one of those two buckets, either financial services or home building?

A. Yes. I predominately view with SEC focus and our lines of business are home building and financial services.

Q. Okay. So is it fair to say that in your view, any entity that isn't in the mortgage or title financial services area is therefore in the home building line of business?

A. Yes. That is the way our SEC reporting documents run and that is the way I look at it from my perspective.

What this testimony made clear was that this operation involved a labyrinth of corporate entities. Below Pulte was Pulte Diversified Companies, Inc. (Diversified), also a holding company without any employees. Beneath Diversified was PHC, the direct corporate parent of both plaintiff and its two general partners: Pulte Home Corporation of Delaware Valley (Delaware General), and Preserve I, Inc. (Preserve General).

Under the partnership agreements, Delaware General was the general partner in Homes, and Preserve General was the general partner in Communities. Communities built and sold houses and developed residential communities for adults over age fifty-five. Conversely, Homes built and sold houses that were

6

not marketed or restricted to any specific demographic. Plaintiff made an initial capital contribution of $9900 in each partnership; the general partner contributed $100 in capital contributions. Plaintiff owned 99% of limited partnership interests in both partnerships; the corporate headquarters had the same address as the cross-respondents and approximately 170 other Pulte entities. Plaintiff did not have physical office locations or property in New Jersey; the cross-respondents maintained offices and owned land in this State.

Pulte labeled "Divisions" markets in which it had established homebuilding operations. "Areas" referred to a group of several Divisions located in larger geographic regions like the northeast. Pulte's New Jersey homebuilding activities were overseen by its Northeast Corridor Division (NCD), headquartered in Pennsylvania. The NCD relied on cross-respondents for daily decision-making at the home-building level. It is important to note that neither plaintiff, cross-respondents, nor the general partner had employees.

All employees who physically worked at the Pulte corporate offices in Michigan were considered employees of PHC, while the employees who physically worked in New Jersey were considered employees of another Pulte subsidiary: Pulte Services Corporation (PSC). James Mullen, Director of Land Entitlements for the NCD, testified that PSC employed about 200 people who

worked in New Jersey on behalf of the NCD in land acquisition and development during the audit years. Cross-respondents are merely landholding entities.

The NCD maintained a principal office in Bernardsville, and, for a time, a second smaller office in Somerset, which was closed during the audit period. The NCD shared its Bernardsville office location during the audit years with Pulte Mortgage, an entity in Pulte's financial division. All employees of Pulte subsidiaries had access to Pulte's website. The users of the website had the capability to upload and share files and access human resources information for each subsidiary.

Rodney Walsh, an NCD construction manager for New Jersey operations, estimated that Pulte entities built more than 1000 homes in this State between 2005 and 2010. If Walsh became aware that a separate Pulte division in the Area was constructing a similar type of house, he would often use a similar floor configuration or architectural plan. Walsh did not remember whether he or any of his colleagues ever used plaintiff's name, or the names of its partners, or cross-respondents name in the course of daily business. He did not personally know any of the people who had served as plaintiff's president.

No entity within the NCD, including plaintiff and cross-respondents, had the authority to purchase land for development until the acquisition was

approved at the corporate level. Once the land was purchased, the NCD would conduct a "feasibility study" of the timetable for developing the land, along with construction costs, sales prices, and other considerations. Walsh testified that the NCD's vice president of finance was primarily responsible for drafting feasibility studies, subject to the approval of the NCD President. Everyone involved in the feasibility studies for New Jersey development projects was employed by PSC.

After a feasibility study was completed, the NCD would seek approval up the chain of corporate authority, starting with the Area. If the Area approved, Pulte corporate officials in the asset management committee would make a final review of the study. Once construction began, sales prices were set at the NCD level, without prior approval from any entities outside the NCD management. Plaintiff did not play any role in these business activities.

Robinson, who in addition to treasurer was also vice president of Pulte, testified that Pulte owned Pulte Realty Corporation (PRC), a subsidiary which operated an internal, central depository and "payables" bank that funded each Pulte subsidiary. When cross-respondents would sell a New Jersey property, the closing proceeds would be "swept up" into PRC's consolidated internal bank and "commingled" with other corporate funds. When any Pulte entity within the

NCD had to pay for labor or services, PRC would draw a check on a zero balance account and fund that amount the same date the check was presented. PRC would then charge the NCD that same amount as an "inter-company receivable payable[,]" plus interest.

These "cash sweeps" would reduce a group member's liability to the bank, thereby reducing its interest expenses. Robinson testified that he did not consider these transfers as the equivalent of the subsidiary "borrowing" from PRC; it was viewed as Pulte borrowing cash from PRC and contributing that amount to the subsidiary, which would then generate an intercompany payable. Neither plaintiff, its general partners, nor cross-respondents attempted to obtain third-party financing during the audit years. Plaintiff did not have a separate bank account and was not authorized to make external investments with money received from the internal bank.

David Furstenberg, Director of Taxes for PHC, testified that the $9900 capital contributions plaintiff made when forming the partnerships could have come from one of two places: from PRC or from the corporate parent[3] as a capital contribution. In its 2005 tax return, plaintiff deducted $12.5 million in

---

[3] From the context of his testimony, it is not clear whether Furstenberg used "parent" to refer to PHC, plaintiff's direct parent, or to Pulte, the apex parent.

interest payments made to the internal bank. Though not entirely certain, Furstenberg believed this could have been funds plaintiff received from the internal bank for its initial capital contribution. No outside money was invested in cross-respondents.

Robinson was responsible to make short-term investments using any excess cash found in the internal bank. This would typically involve money market or commercial paper. The investments took place at the corporate level with "consolidated cash balances." Despite this commingling of corporate funds, Robinson testified that specific money coming into or out of the PRC bank was separately accounted for, depending on its source. Plaintiff's limited partnership interests were its only assets during the audit period and provided all of its income. Plaintiff did not have any other investments.

Plaintiff shared certain officers and directors with its general partners and with Pulte. Robinson was treasurer of Pulte, plaintiff, Delaware General, and Preserve General, as well as an officer in "predominantly all of. . . [Pulte's] subsidiaries." This was done "for ease of any banking arrangement," to allow Robinson the ability to sign documents and access the subsidiaries' bank accounts.

11

Michael Schweninger served as president, chief financial officer (CFO), and a board member on each of Communities' partners: Preserve General and plaintiff. Steven Cook served as director, secretary, and senior vice president for both of those companies and for Delaware General. As noted earlier, Vincent Frees was vice president and controller of Pulte. He served in these capacities from April 1995 until his retirement in 2009. Frees testified that during the audit years, he was an officer for at least seventy-five percent of Pulte's subsidiaries, including for plaintiff, where he served as president, and for plaintiff's two partners--Preserve General and Delaware General--where he served as president and vice president of finance, respectively. His responsibilities included "all of accounting and finance policies, procedures, and systems" for Pulte. His office was located in Michigan.

Frees testified that he did not have any "daily responsibilities" in his capacity as president of plaintiff or of Preserve General, because both entities were merely holding companies. He never considered selling plaintiff's partnership interests or diversifying its investment portfolio because homebuilding was the "core business of the parent company." Cross-respondents were the "hands-on builder[s]" during the audit years. Plaintiff did not have a voice in management in either partnership. Delaware General

12

managed Homes, while Communities acted as its own general partner with respect to managing daily operations.

Plaintiff's directors and officers did not receive a salary in their capacity as officers and directors, but each were separately employed and paid by other Pulte entities and received the benefit of the group's common medical and 401(k) plans through such employment. According to Furstenberg, there were no "outside directors" for any of the entities discussed who were not separately employed by a Pulte entity.

PHC's tax department provided accounting services and prepared the federal and state tax returns on behalf of Pulte and each of its subsidiaries. Twenty-two people worked in the tax department, each of whom were employed by PHC. PHC charged cross-respondents a "Pulte business charge" in order to cover the cost of PHC's overhead for the tax department, among other things. Furstenberg considered PHC, Delaware General, and cross-respondents to be homebuilding companies; PSC to be an "employee service entity" for employees who perform homebuilding services; Preserve General to be a holding company in the homebuilding line of business; and plaintiff to be an investment company that invests in homebuilders.

A-1331-17T3

## II.

We start our analysis by acknowledging that, unlike a corporation, a partnership is not subject to taxation in New Jersey for its earnings. However, earnings are "'passed through' to the partners," Reck v. Dir., Div. of Taxation, 345 N.J. Super. 443, 449 (App. Div. 2001), whose income "shall be subject to the tax . . . imposed on [its] share" of the partnership gains. N.J.S.A. 54A:5-4.

The Corporation Business Tax Act, N.J.S.A. 54:10A-1 to -41, as amended by the Business Tax Reform Act, L. 2002, c. 40 (BTRA), states that "[e]very domestic or foreign corporation which is not hereinafter exempted shall pay an annual franchise tax . . . for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business . . . in this State." N.J.S.A. 54:10A-2. The statute then exempts from the definition of "deriving receipts" or "doing business" certain categories of transactions not at issue. N.J.S.A. 54:10A-2. The statute further adds that a taxpayer, including a foreign corporation, is subject to paying the CBT for the "exercise of its franchise in this State . . . if the taxpayer's business activity in this State is sufficient to give this State jurisdiction to impose the tax under the Constitution and statutes of the United States." N.J.S.A. 54:10A-2.

The Tax Court found "undisputed" that plaintiff, a limited partner in two partnerships doing business in New Jersey, earned New Jersey sourced income from its partnership interests. Preserve, 30 N.J. Tax at 161. The court also found that the partnerships' New Jersey business involved the "production and sales of a tangible product (improved real property) in New Jersey," which was the New Jersey source of plaintiff's income. Ibid. Plaintiff does not challenge these settled principles of tax law in this appeal.[4] The court found cross-respondents' homebuilding and selling operations in this State resulted in New Jersey sourced income for plaintiff. Consequentially, plaintiff "is undoubtedly subject to CBT for the 'privilege of deriving receipts from' New Jersey." Preserve, 30 N.J. Tax at 161.

Plaintiff argues Judge Sunder erred when she held that plaintiff had an "automatic economic nexus" to this State upon its receipt of partnership income from New Jersey sources. According to plaintiff, as a foreign limited partner, it was not subject to the CBT for passively receiving income from a New Jersey source. The Legislature did not intend, plaintiff argues, for the "deriving

---

[4] Plaintiff also does not challenge the constitutionality of the tax nor the factual question of whether it derived New Jersey sourced income from the partnerships. We thus consider these issues waived. See Midland Funding LLC v. Thiel, 446 N.J. Super. 537, 542 n.1 (App. Div. 2016).

A-1331-17T3

receipts" clause in N.J.S.A. 54:10A-2 to "broadly" apply to foreign limited partners, whose taxability is governed by separate statutory provisions enacted at the same time: N.J.S.A. 54:10A-15.7(a) and -15.11. In plaintiff's view, these statutes would be rendered superfluous, illogical, or absurd if a foreign corporation became subject to CBT "automatically" under N.J.S.A. 54:10A-2 merely by deriving receipts from New Jersey sources. Plaintiff's argument misconstrues the statutory language.

When this court reviews a Tax Court decision, it "generally extend[s] enhanced deference to the expertise of the Tax Court." BIS LP, Inc. v. Dir., Div. of Taxation, 26 N.J. Tax 489, 493 (App. Div. 2011). The Tax Court's factual "findings will not be disturbed unless they are plainly arbitrary or there is a lack of substantial evidence to support them." Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 46 (App. Div. 1990). Accord Hackensack City v. Bergen Cty., 405 N.J. Super. 235, 243 (App. Div. 2009). However, "the judge's interpretation of a statute is not entitled to such deference and is subject to . . . de novo review." Waksal v. Dir., Div. of Taxation, 215 N.J. 224, 231 (2013) (quoting Advance Hous., Inc. v. Twp. of Teaneck, 422 N.J. Super. 317, 327 (App. Div. 2011)).

A-1331-17T3

As an appellate court, we "also recognize the expertise of the Director, particularly when the Director's expertise is exercised in the 'specialized and complex area' of the tax statutes." BIS II, 26 N.J. Tax at 493 (quoting Metromedia, Inc. v. Dir., Div. of Taxation, 97 N.J. 313, 327 (1984)). For this reason, this court's "review of the Director's decisions regarding the imposition of tax is 'limited.'" Wells Reit II-80 Park Plaza, LLC v. Dir., Div. of Taxation, 414 N.J. Super. 453, 461 (App. Div. 2010) (quoting Quest Diagnostics, Inc. v. Dir., Div. of Taxation, 387 N.J. Super. 104, 109 (App. Div. 2006)). The Director's "interpretation of the operative law is entitled to prevail, so long as it is not plainly unreasonable." Waksal, 215 N.J. at 231 (quoting Metromedia, 97 N.J. at 327).

As our Supreme Court has made clear that when courts interpret a statute, "the paramount goal" is to carry out the legislative intent and "generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005). Courts should "ascribe to the statutory words their ordinary meaning and significance." Ibid. "Where a statute is clear and unambiguous on its face and admits of only one interpretation, a court must infer the Legislature's intent from the statute's plain meaning." O'Connell v. State, 171 N.J. 484, 488 (2002). "If the language is not clear, [courts] look to

the legislative history to aid in determining the legislative intent of the statute."

Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008).

Plaintiff argues that the Tax Court erroneously concluded that plaintiff's receipt of New Jersey sourced income provided "automatic economic nexus" to the State. This argument mischaracterizes Judge Sunder's decision. Although Judge Sunder found that plaintiff was "subject to the CBT simply by virtue of having unquestionably derived income from New Jersey sources," that did not end her analysis. Judge Sunder conducted an extensive analysis under the heading "Preserve's Nexus To New Jersey" to determine whether plaintiff had a sufficient constitutional nexus to New Jersey to subject it to taxation as a foreign corporation. Preserve, 30 N.J. Tax at 164. At the conclusion of this constitutional due process analysis, Judge Sunder held:

> In sum, the record amply supports a finding that the lines between the partnerships, the general partner, Preserve and PHC were far from sharp and distinct and in fact were completely blurred. Preserve was not a mere passive investor, actively involved in an unrelated business, as was the finding for the foreign corporate limited partner in BIS. . . . Indeed, Preserve had no authority to make, sell, or diversify any investments let alone have its own independently held/operated external bank/financial account. The court concludes that under all of the facts, Preserve had nexus to New Jersey.

18

[Preserve, 30 N.J. Tax at 168 (internal citations omitted).]

Plaintiff further argues that the Legislature did not intend N.J.S.A. 54:10A-2 to apply "broadly" to foreign limited partners. This approach is irreconcilable with the language of N.J.S.A. 54:10A-2, which requires "[e]very domestic or foreign corporation" to pay the CBT for the privilege of, among other things, deriving receipts from New Jersey sources, unless an express statutory exemption applies or the tax exceeds the State's constitutional power to levy the tax. A corporation's status as a foreign limited partner is not one of the listed exemptions. Ibid.

The legislative history and judicial precedent confirms Judge Sunder's construction of the statute. The BTRA was designed "to increase equity among business taxpayers and close[] numerous loopholes that allow many profitable companies to reduce their taxable New Jersey income." Assembly Budget Comm. Statement to A. 2501 (June 27, 2002). "By extending the reach of the CBT to the income of all corporations that derive income from New Jersey," the law was designed to "extend[] the reach of the CBT to the full extent permitted under the United States Constitution and federal statute." Id. at 4. See also Springs Licensing Grp., Inc. v. Dir., Div. of Taxation, 29 N.J. Tax 1, 16 (2015) (noting that, under the BTRA, the application of the CBT to foreign corporations

under N.J.S.A. 54:10A-2 "is explicitly limited only by the mandates of the federal Constitution and statutes.").

This interpretation does not, as plaintiff contends, render N.J.S.A. 54:10A-15.7 and -15.11 illogical or absurd. N.J.S.A. 54:10A-15.11 directs partnerships to remit tax payments on behalf of any nonresident foreign corporate partners, unless the nonresident has consented to pay tax on its own. N.J.S.A. 54:10A-15.7 explains that a different allocation formula applies to payments owed by a partnership on a foreign partner's behalf, depending on factors such as whether the partner is unitary with the partnership and on whether the partnership is a qualified investment partnership. Stated differently, N.J.S.A. 54:10A-15.11 provides an exception to the general rule that a partnership is generally not subject to taxation and N.J.S.A. 54:10A-15.7 describes how to determine the amount of CBT liability. National Auto Dealers Exchange, L.P. v. Dir., Div. of Taxation, 30 N.J. Tax 343, 351-52 (2018) (discussing how, under N.J.S.A. 54:10A-15.7 and -15.11, the CBT remitted by a partnership on behalf of a nonresident corporate limited partner is attributable to the partner, not the partnership).

These statutes are silent, however, about what types of business activities or generated income will subject a foreign corporation to the CBT. The answer

20

to this threshold question is found in N.J.S.A. 54:10A-2, which provides that "every" foreign corporation is subject to the CBT "for the privilege of deriving receipts from sources within this State, or for the privilege of engaging in contacts within this State, or for the privilege of doing business . . . in this State" as long as that business activity is taxable under federal law. Similarly, N.J.S.A. 54:10A-2 does not address the questions addressed by sections 15.11 and 15.7, respectively--whether a partnership should remit payment on behalf of its foreign corporate partner's taxable business activities and how to allocate the partner's share of receipts. Because the latter statutory provisions concern different topics than those at issue in N.J.S.A. 54:10A-2, there is no merit to plaintiff's argument that the Tax Court's interpretation would render N.J.S.A. 54:10A-15.7 or -15.11 superfluous or absurd.

In short, plaintiff offers no countervailing interpretation of N.J.S.A. 54:10A-2 that would construe the statute to mean anything other than what its plain language suggests: a foreign corporation shall pay the CBT for "the privilege of deriving receipts from sources within this State" as long as such taxation falls within federal constitutional limits and no statutory exemption applies. Because no statutory exemption applies and plaintiff has not challenged either the constitutionality of the tax or the court's finding that plaintiff

undisputedly derived receipts from New Jersey sources, Preserve, 30 N.J. Tax at 161, we affirm the court's holding that plaintiff was subject to the CBT under the plain language of N.J.S.A. 54:10A-2.

Plaintiff's arguments predicated on the regulations promulgated by the Director pursuant to N.J.S.A. 54:10A-27 lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). We affirm substantially for the reasons expressed by Judge Sunder in her well-reasoned written opinion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION